Harrell ALEXANDER, Sr.,
Plaintiff-Appellant,

v.

GARDNER–DENVER COMPANY, a
Delaware Corporation,
Defendant-Appellee.

No. 75–1091.

United States Court of Appeals,
Tenth Circuit.

July 2, 1975.

Henry V. Ellwood, Denver, Colo., for plaintiff-appellant.

Robert G. Good, Denver, Colorado, for defendant-appellee.

Before LEWIS, Chief Judge, and HILL and DOYLE, Circuit Judges.

HILL, Circuit Judge.

Appellant brings this appeal seeking reversal of the trial court's judgment on the merits for appellee. We have previously dealt with one issue in this case, Alexander v. Gardner-Denver Co., 466 F.2d 1209 (1972), and were reversed by the Supreme Court, Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

Appellant initially was hired by Gardner-Denver Company (Company) on May 10, 1966, as a trainee for plant maintenance work in the yard department. After a transfer to the cleaning department due to lack of work, a layoff due to lack of work, a recall to the cleaning department, and a return to the yard department, appellant, on June 11, 1968, successfully bid into the drill department as a trainee to operate a single spindle drill press. This was an incentive job where compensation was based to some extent on productivity. Appellant's duties included setting up tools according to blueprints and performing the neces-sary drilling function as outlined in a time study sheet the company prepared. This was precision work because the holes had to be drilled within close tolerances. The parts appellant worked on were integrated into Company's finished products; parts moved through the manufacturing process and errors beyond prescribed tolerances would cause parts to be scrapped if discovered at any stage.

Scrap, of course, costs Company money; Company maintains records of scrap produced by each employee in the drill department and a monthly tabulation is prepared and available in computer printout form. The determination that a part is "scrap" is made at various stages, including: (1) the operator may throw the part in a bin; (2) the supervising foreman may reject a part; and (3) the plant inspectors who examine finished parts and products may also reject defective pieces. At that last stage, assigning fault for the defect is difficult; however, some workmen stamp their initials into the parts on which they have worked.

Appellant's relevant work record, abstracted from the trial court's findings, is detailed as follows. On July 18, 1968, appellant was given a pink slip (an "early warning record") which advised him that he ran 33 parts of which 17 had oversized diameter holes. On August 26, October 28 and December 30, 1968, appellant received wage and labor grade increases as each time he completed nine weeks of the training period. Appellant did not receive his scheduled wage and grade increase on February 28, 1969, because his supervisor determined that appellant was producing excess scrap. On May 5, 1969, appellant received the held back raise and achieved labor grade 6. Appellant received his second pink slip on May 15, 1969. The slip advised him he was careless in running 13 pieces of scrap during April and six pieces on one day. On June 6, 1969, appellant received a notice of separation which was changed to a notice of suspension; appellant was suspended for two days without pay. Concluding that excess

scrap was still being made, appellant's supervisor held up his step wage increase due on July 16, 1969. Appellant received a wage and grade increase on August 4, 1969. Appellant was given a notice of separation and was suspended subject to termination on September 29, 1969. This action resulted from his supervisor's conclusion that appellant's work was defective (apparently 13 pieces of scrap out of 50 pieces run).

Appellant was under the supervision of the same foreman, Oscar McFarlin, all the time appellant was in the drill department. McFarlin issued all the "pink slips" and the notices of separation to appellant. Company's policy of "progressive discipline" had traditionally operated with a pink slip for each of the first two scrap violations and discharge for the third scrap violation. In appellant's case the third violation did not result in a discharge but only a two-day suspension without pay.

Through his union, appellant filed a grievance for wrongful termination; an arbitrator decided that appellant was terminated for just cause. (The arbitrator did not consider whether racial discrimination was involved in the discharge.) The Civil Rights Commission of Colorado declined action on a complaint appellant filed. Following notification of the state commissioner's action, the Equal Employment Opportunity Commission (EEOC) investigated and reviewed appellant's complaint. On January 1, 1970, EEOC decided there was no reasonable cause to believe the company had violated Title VII of the Civil Rights Act of 1964. After notification of EEOC's decision, appellant filed this action claiming violation by the Company of 42 U.S.C. § 2000e.[1]

The trial court, following remand from the Supreme Court, concluded that appellant was discharged "for a legitimate

nondiscriminatory reason". The court said, "The evidence does not support a finding that Oscar McFarlin has a general racial bias." The court reviewed McFarlin's comparative treatment of other employees and apparently did not believe there was a showing of discriminatory treatment.

■ Appellant makes one broadside attack on the judgment below: the trial court failed to apply the correct legal standards to the evidence before it. Appellant correctly states that proof of a discriminatory intent on McFarlin's part is not necessary for a prima facie case. Muller v. United States Steel Corp., 509 F.2d 923 (10th Cir. 1975), cit'g Spurlock v. United Airlines, Inc., 475 F.2d 216 (10th Cir. 1972); Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972). The trial court did state that "[t]he unfortunate result is the necessity to decide whether this white foreman was racially motivated in his treatment of the black employee." The trial court found that "[t]he evidence does not support a finding that Oscar McFarlin has a general racial bias." Appellant claims the evidence does not support that finding and points to four matters: (1) McFarlin was born in Texas and lived in North Carolina before coming to Colorado; (2) McFarlin used the term "colored" to describe blacks in his testimony; (3) within three weeks after appellant came to McFarlin's department, McFarlin attempted to get rid of appellant; and (4) a witness testified that McFarlin once stated, "If that black son-of-a-bitch gets his job back, Mertz is going to have to get another foreman."

■ The trial court's findings are not reversible unless clearly erroneous. Spurlock v. United Airlines, Inc., *supra.* Putting to one side the general unpersuasive quality of several of the factors appellant mentions, we find evidence in

1. 42 U.S.C. § 2000e–2 provides in pertinent part:

"(a) It shall be an unlawful employment practice for an employer—

"(1) . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."

the record (detailed at the end of this opinion) to support the trial court's finding and hold it is not clearly erroneous.

The trial court did not end its inquiry on the intent issue but also considered " . . . the comparative treatment of other employees by Oscar McFarlin." This is the point where appellant's case is and was insufficient. As we recently stated in Muller v. United States Steel Corp., *supra*:

> It is sufficient that the employer's conduct produced discriminatory results. . . . Where, as here, there are circumstances showing discrimination, a prima facie case exists. At bar there is the added factor—the lack of meaningful standards to guide the promotion decision, whereby there is some assurance of objectivity.

Thus, before we can condemn the subjectivity of the standards applied by the foreman (the trial court found those standards to be subjective), we must determine that discriminatory results occurred. In Rowe v. General Motors Corp., *supra*, relied on by appellant there was considerable statistical evidence of discrimination. *See* Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245 (10th Cir. 1970), *cert. den'd*, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971). On appeal, appellant claims the evidence established discriminatory results in the following matters. (1) The company had a policy and practice of allowing employees who could not perform in the production department to transfer or be reassigned to another department. Appellant was not given an opportunity to do so although the Union requested he be allowed to go back to the yard department. White employees were given this option and their supervisors could withdraw pink slips. (2) White employees who made equal or greater amounts of scrap than appellant were not given pink slips.

■ The Company did have a practice of allowing a man to transfer out of an incentive job into a nonincentive one. Apparently, this transfer resulted from the worker's voluntary decision after one or more pink slips or when his supervisor recommended a transfer after one or more warnings. Although the evidence conflicts as to the date of the occurrence and the type of job pointed out (janitorial or yard department), it is clear that on one occasion McFarlin pointed out a job on the bulletin board to appellant and suggested he might want to transfer.[2] There was no evidence, however, that before his separation notice was served appellant ever sought a transfer.

■ We do not believe the fact that another supervisor once withdrew a pink slip of a white employee is sufficient to establish any discrimination.

■ Appellant's second alleged discriminatory result likewise is not supported by the record. As appellant states, pink slips were issued to him for 17 parts of scrap on one day and for 13 pieces of scrap in one month (six in one day). Then appellant points out scrap records indicating one Axinn ran 86 pieces on one day and one Nichols ran 13 pieces on one day but did not receive pink slips. We cannot locate pink slips in the record for these instances. We do find a pink slip on Axinn for nine pieces of scrap. One Hackett got a pink slip for reworking seven pieces and scrapping 12 pieces between September 19 and September 26, 1966. Hackett got another pink slip for 14 pieces of scrap on January 20, 1970. Hackett was later suspended for two days as the result of scrapping eight pieces on February 3, 1970. We do not believe the evidence establishes any discriminatory treatment based on issuance of pink slips in relation to the number of scrap pieces. Moreover, the record is clear that the

---

**2.** In his trial testimony, appellant attacked the suggested transfer as having been racially motivated. He said, "It was quite obvious why they was [sic] pointing out the job. They made the point that other Caucasians was [sic] being laid off with less plant seniority, less middle seniority, department seniority and trying to get me to move back a step which would allow a Caucasian to take the place."

number of scrap pieces was only a factor in the issuance of a pink slip. Also considered were the cost of the items and any good reason for the scrap (e. g., operator switched from one type of machine to another). Consequently, some differences in the number of scrap pieces resulting in a pink slip are explainable.

■ As appellant indicates, there was evidence that no production employee, other than Alexander, was fired for scrap production in the eleven years preceding the hearing. Company's personnel manager could not recall any production employee besides Alexander who was fired for scrap in 1969, 1970, 1971 or 1972. Two white inspectors had been fired for errors in 1967. Although this appears to be a discriminatory result, we believe that a finding by the trial court, supported by the record, explains this result. The applicable finding is as follows: "The evidence shows that the usual result of the receipt of a second warning slip for defective work by a trainee was his election to transfer into a different department where precision work was not required."[3] We do not believe the record establishes any inequality in treatment between appellant and other employees.

■ Other evidence supports the trial court's finding that the discharge was unrelated to race. McFarlin supervised and trained another black employee at the same time plaintiff was in training; that black employee had scrap problems but his work improved and he remained with the Company as a drill press operator. There was testimony that McFarlin spent large amounts of time seeking to train appellant following the issuance of the first pink slip; this training apparently was a unique effort which resulted from McFarlin's determination during the probationary period that appellant should be returned to the yard department and the night general foreman's decision to give appellant more training. Usually two pink slips were given and the third violation for scrap led to termination. Following appellant's third violation, the notice of separation given by McFarlin was changed to a suspension.[4] Consequently, others who later received three pink slips were successful in using appellant's case as precedent and were only suspended instead of terminated.

Our review of the decision below and the record convinces us that the trial court applied the correct legal standards in this case and that the trial court's findings are not clearly erroneous.

Affirmed.

---

3. Appellant points to one Schneider, a white employee with four pink slips who was allowed to transfer to another Company job in 1973 or 1974. The testimony indicated Schneider was suspended subject to discharge and a hearing had been held; at that point Schneider requested that no grievance be filed on his behalf because he wanted to get out of incentive. We have not located any evidence in the record that appellant sought a transfer out of incentive, even at this stage of the discharge process. The arbitrator suggested in his December 30, 1969, decision that the Union and the Company get together to determine if it would be feasible to have grievant [appellant] transferred back to his old job.

In a memo dated October 2, 1969, from the plant superintendent to appellant the superintendent stated that "With his [appellant's] work record in the Drill Department and his record in his previous department, I could not recommend his transfer to another department in the plant." We do not know if any transfer request prompted this memo. We do not think this evidence indicates discrimination.

4. McFarlin explained the reason for the change in this way: " . . . I had given him intensive training before, and I knew I had spent a lot of time with him and the company knew how much time and money were spent in trying to train the man, and they were also trying to get as many Black people on the machines as possible, to get them out of the medial [sic, menial], out of the general labor classification, and trying to bring them into production where they would make more money and a better living for themselves."