Maxine E. **ACREY**, Plaintiff–Appellee,

v.

**AMERICAN SHEEP INDUSTRY ASSOCIATION, a Corporation,** Defendant–Appellant.

No. 91–1321.

United States Court of Appeals, Tenth Circuit.

Dec. 29, 1992.

Before LOGAN, LAY* and BARRETT, Circuit Judges.

LOGAN, Circuit Judge.

Defendant American Sheep Industry Association (ASI) appeals from judgment entered following a jury verdict in favor of plaintiff Maxine E. Acrey in her action brought under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.* The jury found not only discrimination but willful violation of the ADEA. The award included $147,000 in front pay in lieu of reinstatement, $76,000 for willful violation, attorneys' fees of $55,168, and interest. ASI appeals from the district court's denial of its motion for judgment notwithstanding the verdict, or in the alternative, for new trial.

ASI argues on appeal that plaintiff did not produce sufficient evidence to meet her burden of proof in four respects: (1) to establish that she was satisfactorily performing her job, (2) to support a finding of constructive discharge, (3) to rebut ASI's articulated nondiscriminatory business reasons for its handling of plaintiff, and (4) to support a finding of willfulness. ASI also asserts that the district court erred in allowing testimony from another former employee, in awarding front pay, and in not reducing the damages award for plaintiff's failure to mitigate damages.

I

Plaintiff was hired in 1984 at the age of forty-five as operations manager for the American Sheep Producers Council (ASPC). She had had more than twenty years of accounting and administrative experience, including work as an auditor with a major CPA firm and as an assistant financial director for IT & T. II R. 36–37. Her responsibilities with ASPC included finance, accounting, building maintenance, benefits, personnel, and general operations. Early in her tenure with ASPC she computerized the manual bookkeeping system,

John M. Husband (Brian M. Mumaugh with him, on the brief) of Holland & Hart, Denver, CO, for defendant-appellant.

Penfield W. Tate, II of Trimble, Tate and Nulan, Denver, CO (John Mosby, with him on the brief), for plaintiff-appellee.

* The Honorable Donald P. Lay, Senior United States Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

working with the in-house programmer to develop the accounting procedures. II R. 38.

On January 24, 1989, ASPC voted to merge with the National Wool Growers Association (NWGA) to form ASI. The merger of the ASPC and NWGA necessitated many corporate changes. Among those were making personnel decisions, relocating the organization, relinquishing existing office space, complying with United States Department of Agriculture regulations, and merging the accounting records of the two organizations. Changing ASI's accounting method from a cash basis system to a more complex accrual accounting system was a major result of the merger. VII R. 120. Some of these merger activities, including finalizing the new accounting system, went on for several months.

Plaintiff resigned effective September 29, 1989. She was replaced shortly thereafter by a twenty-seven year old male, Paul Zulauf. Evidence at the trial focused principally upon whether plaintiff could satisfactorily perform the job she held after the merger, whether her termination was a constructive discharge, and, if so whether plaintiff rebutted the employer's alleged nondiscriminatory business reasons for the termination. We discuss below the relevant evidence on these points that the jury could rely upon to support its verdict in favor of plaintiff.

■ ASI's motion for judgment notwithstanding the verdict challenged the sufficiency of the evidence to support the verdict. The standard of review for denial of a motion for judgment notwithstanding the verdict requires us to "view the evidence most favorably to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from the evidence." *Spulak v. K Mart Corp.*, 894 F.2d 1150, 1153 (10th Cir.1990). We must affirm denial of defendant's motion if the record reveals sufficient evidence for the jury to have found in favor of plaintiff. *Cooper v. Asplundh Tree Expert Co.*, 836 F.2d 1544, 1547 (10th Cir.1988). We were unable to evaluate the appeal satisfactorily on the basis of the appendices provided by the parties. Therefore, we obtained and read the entire transcript of the trial. *See* Fed.R.App.P. 10(e), 11(f). Record citations herein are to the trial transcript.

## II

■ ASI challenges whether plaintiff made a prima facie case, contending she did not establish that she was satisfactorily performing her job at the time of her termination of employment. We have carefully examined the record and believe that a jury could conclude that plaintiff was performing satisfactorily before the merger and that any post-merger deficiencies were a consequence of her receiving a less than adequate opportunity during the transition period to become adept at her new and more complex job responsibilities.

Plaintiff's three supervisors during her employment, Rita Kourlis (1984–86), Rodger Wasson (1986) and Eldon White (1987–89), all testified. Although Wasson and White presented testimony about plaintiff's performance problems before the merger, White also indicated those performance deficiencies had been rectified. III R. 90. White, plaintiff's immediate supervisor at the time of her alleged constructive discharge, and representatives from defendant's independent accounting firm, Dollinger, Smith & Co. (Dollinger firm), confirmed that plaintiff was properly performing her job before the merger, VII R. 106; that they were unaware of significant deficiencies, III R. 33, 43; and that plaintiff was needed to facilitate the merger. V R. 54.

Much of plaintiff's evidence concerned her treatment during the months following the January 1989 merger vote, focusing on her exclusion from merger decisions, ASI's failure to provide her with training on the new accounting system, and ASI's communication in both words and deeds that her services were no longer needed. Plaintiff testified that she was excluded from pre-merger meetings; that she was told not to work with the Dollinger firm on the new accounting system; that information she needed to formulate the new budget was withheld from her; that her role in attend-

ing Board of Directors meetings was curtailed; that she received minimal training on the new Solomon computerized accounting system; and that White again began criticizing her work performance. II R. 54–65, 70, 76, 98; III R. 9.

ASI's responsive evidence concerning plaintiff's treatment during the seven or eight months immediately preceding her alleged constructive discharge was somewhat inconsistent. Much of ASI's evidence about plaintiff's performance consisted of testimony concerning a meeting in the middle of February 1989 in which plaintiff's performance was evaluated in her absence, and a second meeting in August 1989 attended by plaintiff, Wasson and White, in which they discussed plaintiff's alleged performance deficiencies. Despite plaintiff's satisfactory work record when the merger was approved, both her supervisor and Dollinger firm representatives concluded in February 1989, only a few days after the merger, that plaintiff lacked the ability to assist in creating and utilizing the new and more complex accounting system developed as a consequence of the merger. III R. 37–38; V R. 77; VII R. 86–87. *See also* V R. 44. White testified that the Dollinger firm objected to having plaintiff involved in the development of the new accounting system, despite his and Wasson's insistence that she remain involved. V R. 41; VI R. 26–27. White further stated that plaintiff attended numerous meetings regarding the merger of the accounting functions. VI R. 8. But he also testified that as early as the February 1989 meeting he had determined that plaintiff lacked the ability to manage the creation of the new accounting system. VI R. 9. Plaintiff testified that White asked her to quit on at least two occasions, February 8 and April 12, 1989, stating that she was "too old ... and did not fit the image [ASI] wished to project." II R. 55, 63, 81, 157.

Wasson testified that he depended upon the Dollinger firm to evaluate whether plaintiff had the ability to "carry out the new job." VI R. 27. Larry Dollinger reported to Wasson that plaintiff lacked the vision to manage the new accounting system, and he continued to believe she was

incapable. VI R. 26–27; VII R. 97. Paul Zulauf, a senior auditor with the Dollinger firm, testified that plaintiff lacked the ability to manage the Solomon system, which was to be the replacement software. Zulauf, who was apparently the principal individual charged with training ASI employees on the new system, *see* VII R. 134, testified that he did train plaintiff during the implementation of the new computer system, III R. 38–41, 52, but he was unable to identify that training specifically. He agrees she was not given training on the Solomon software system. III R. 58. Zulauf also admitted to meeting with White in August 1989, before plaintiff's termination, to discuss his being hired to replace plaintiff. III R. 29, 48.

Although the Dollinger firm representatives testified that they worked with plaintiff extensively, their billings to ASI reflected the ongoing training they provided to plaintiff's younger counterpart at NWGA, Sue Sharnas, but none for training plaintiff. VII R. 114.

We believe that from this evidence the jury could conclude plaintiff was performing satisfactorily before the merger. We also believe the jury could conclude that proper training to enable her to operate under the new accounting system was deliberately withheld from her during the transition period. The jury was entitled to infer that one reason for this was White's desire to force plaintiff to quit or to have an excuse to fire her. The jury was entitled to infer that another reason may have been Zulauf's interest in securing plaintiff's job for himself. We conclude that sufficient evidence exists to support plaintiff's burden to establish that she was able to perform her job at the time of her termination.

### III

ASI also challenges whether plaintiff established constructive discharge. We have defined the standard for constructive discharge as whether the employer's illegal discriminatory acts fostered a climate in the workplace that would compel a

reasonable person to resign. *Derr v. Gulf Oil Corp.,* 796 F.2d 340, 344 (10th Cir. 1986).

■ Plaintiff was evaluated negatively immediately after the merger was approved. The jury could conclude she was treated as incapable and uneducable throughout the final months of her employment. As noted above, plaintiff testified that on at least two occasions White, her immediate supervisor, asked her to quit, citing her age and her "image." Plaintiff testified that on August 22, 1989, Rodger Wasson asked her to resign and told her that "if I didn't I would be fired." III R. 9; II R. 94–95. White and Wasson denied these charges, but conflicting testimony is a matter for the jury to determine. It is clear from the record that Zulauf, charged with training plaintiff, wanted her job, and eventually got it. *See* III R. 29, 48, 63.

The jury could believe that by August 1989 plaintiff reasonably believed she was at risk of losing her job. Her supervisor had confronted her with a litany of performance shortcomings; long-standing job responsibilities were taken from her; and she received inadequate information and training to perform her new duties. ASI presented evidence that plaintiff was not performing her job satisfactorily by August 1989, but at a meeting that month she was discouraged from resigning. VI R. 10, 33–35. That meeting covered several alleged problems, but some could have stemmed from less than adequate training by ASI and the Dollinger firm in her more complex job responsibilities, and her inexperience operating the new computerized accounting system which apparently was not yet fully implemented. Plaintiff testified that although she tendered her resignation it was because she was "too tired" to fight. II R. 96. We conclude that plaintiff presented sufficient evidence to support the jury's determination that she was constructively discharged.

## IV

■ Once a plaintiff establishes a prima facie case, the burden of producing evidence shifts to the defendant employer to rebut plaintiff's case by articulating legitimate nondiscriminatory reasons for the challenged employment action. Plaintiff, of course, carries the ultimate burden of persuasion to prove age was a determinative factor, and, if the employer presents nondiscriminatory reasons for the action, to show that the employer's stated explanation is merely a pretext for discrimination. *Cooper,* 836 F.2d at 1547. *See also Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

■ ASI argues that plaintiff did not successfully rebut its evidence of legitimate business reasons for denying plaintiff the right to continue in her position. We acknowledge the record presents a close case. The employer presented evidence of plaintiff's problems with persons under her supervision, and principals in the Dollinger firm advised ASI that they thought plaintiff was incapable of managing the changeover to the new accounting system. But we think the jury is entitled to believe that management's lack of confidence in plaintiff was in part based upon her age. There is support for this view in plaintiff's testimony that White told her she was too old and did not fit the image the merged organization wanted to project. It is particularly notable that the negative evaluation of plaintiff's post-merger job performance occurred so quickly after the approval of the merger. The evidence permitted a finding that management prematurely concluded plaintiff was not capable of functioning within the merged ASI organization, and consequently provided her no reasonable opportunity to succeed within that new entity. A jury could infer that defendant's presumptions in this regard were based in part upon plaintiff's age. All of the individuals with whom plaintiff worked at ASI and the Dollinger firm were substantially younger than she was. Dollinger, Zulauf and John Smith of the Dollinger firm; White, Wasson, Kourlis and Richard Wertheimer of ASPC; and Sharnas of NWGA, were all under age forty. II R. 34, 152; VI R. 66; VII R. 167, 172. Beverly Fay contended she was forced to resign from

ASPC in 1985 at the age of fifty-four, after approximately eight years of employment. This left plaintiff as the oldest member of the group of ASI managers with whom she interacted on a regular basis. Sharnas, plaintiff's younger counterpart at NWGA, apparently received training on the Solomon system and plaintiff did not.

The record contains sufficient evidence to permit the trier of fact to be persuaded plaintiff was discriminated against on the basis of her age.

## V

■ Although we uphold the jury's finding that age was a determinative factor in plaintiff's constructive discharge, we have a different view concerning the sufficiency of the evidence to support a finding of willfulness. A willful violation of the ADEA entitles a plaintiff to liquidated damages, 29 U.S.C. § 626(b). We have defined the standard for finding willful age discrimination as whether the fact-finder could conclude that the plaintiff's age was the *predominant* factor in the employer's treatment. *Cooper,* 836 F.2d at 1551. Under that test, we are convinced here that the record does not contain sufficient evidence for the jury to have concluded defendant's violation of the ADEA was willful, and we must vacate the $76,000 award for willfulness.

■ Clearly the Dollinger firm advised ASI that it considered plaintiff unable to handle the more complicated accounting system of the merged organizations. Some of this advice appears to have been based upon plaintiff's lack of formal education in accounting. Dollinger, Smith, and Zulauf, of that firm, were all certified public accountants. They seemed to assume only a CPA could do the work after the merger. Their opinion may also have been based in part upon Zulauf's desire to take over plaintiff's job. These reasons, however, are not necessarily related to plaintiff's age.

Further, the record contains evidence that plaintiff had poor interpersonal skills and strained relationships with her subordinates and co-workers. She had strained relations with White, her immediate supervisor, and with Wasson, who was above White in the hierarchy, at least some of which did not appear related to her age. In June 1989, plaintiff forged the signature of a co-worker in an effort to secure a small personal loan against her pension funds. Neither ASI nor the co-worker were placed at financial or other risk as a consequence of this forgery, and plaintiff repaid the borrowed funds. ASI took no disciplinary action against plaintiff because her services were needed during this time to implement the merger of ASPC and NWGA. V R. 54. Plaintiff's supervisors at ASI were also unhappy with plaintiff for having misread the lease of the building ASPC occupied at the time of the merger; she told them it required sixty days notice to vacate instead of six months, thereby causing ASI to incur some unnecessary costs. *See* II R. 89–90.

Although we are reluctant to overturn a jury finding on a fact issue, we must conclude, based upon the record as a whole, that no reasonable jury could have found that age was the predominant motive in the constructive discharge of plaintiff.

## VI

Defendant objects to the district court's ruling allowing testimony by a former employee, Beverly Fay. Fay was not listed as a witness for plaintiff in the standard pre-trial witness lists, but appeared in a supplemental list ASI received four days before trial as a possible rebuttal witness.

■ We review rulings as to the admissibility of evidence under an abuse of discretion standard. *Agristor Leasing v. Meuli,* 865 F.2d 1150, 1152 (10th Cir.1988). Fay's testimony was very brief. As a rebuttal witness, the scope of her testimony was confined. After review of the record as a whole we cannot conclude that the probative value of this testimony was outweighed by any alleged prejudice to ASI. We hold, therefore, that the district court did not abuse its discretion in permitting Fay's testimony.

## VII

The final issue concerns reducing the damage award, specifically whether front pay was properly awarded in lieu of reinstatement and whether plaintiff exercised due diligence in mitigating her damages. We have held that reinstatement is the preferred remedy in ADEA cases, but that a plaintiff is entitled to front pay when reinstatement is not feasible. *Spulak*, 894 F.2d at 1157; *Cooper*, 836 F.2d at 1553. The parties agreed to permit the judge to make this determination. In explaining its reasons for awarding front pay the district court acknowledged defendant's hostility toward plaintiff, and found that the relationship between the parties had been irreparably damaged. The record contains examples of sharply conflicting evidence about specific incidents reflecting on plaintiff's job performance and treatment. At best, these illustrate a poor working relationship between the parties; at worst, an absence of mutual trust. The district court's decision that a productive and amicable working relationship between the parties was not feasible is supported by the record and hence not an abuse of discretion. *See EEOC v. Prudential Fed. Sav. and Loan Ass'n*, 763 F.2d 1166, 1172–73 (10th Cir.1985), *cert. denied*, 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985); *EEOC v. Sandia Corp.*, 639 F.2d 600, 627 (10th Cir.1980).

Plaintiff does have an obligation to mitigate damages. The employer, however, carries the burden of showing plaintiff failed to exercise due diligence in mitigating any losses. *Spulak*, 894 F.2d at 1158. ASI did not establish that plaintiff's efforts to mitigate her damages were unreasonable under the circumstances. The award of front pay in lieu of reinstatement was not clearly erroneous. *See Sandia Corp.*, 639 F.2d at 627.

We therefore REVERSE that portion of the judgment awarding liquidated damages for a willful ADEA violation, and AFFIRM the remainder of the district court's judgment.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent herewith.

BARRETT, Senior Circuit Judge, dissenting:

I respectfully dissent.

I note with interest that the majority opinion does not rest on the appendices provided by the parties, but, and rather, the entire transcript of the trial, ordered up by the majority pursuant to Fed.R.App.P. 10(e) and 11(f). While this practice is permissible, I suggest that the better practice is to place the burden squarely on the part of counsel to "... see that the record excerpts are sufficient for consideration and determination of the issues on appeal and the court is under no obligation to remedy any failure of counsel to fulfill that responsibility." *General Order*, 10th Cir., October 25, 1991, p. 5. *See also Deines v. Vermeer Mfg. Co.*, 969 F.2d 977, 978–79 (10th Cir.1992) (record on appeal did not contain transcripts of evidence sufficient for review of duty of care, weight of evidence, correctness of jury instructions or trial court's evidentiary rulings); *Trujillo v. Grand Junction Regional Center*, 928 F.2d 973, 976 (10th Cir.1991) (court could not review factual findings by trial court absent trial transcript); *Sil–Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1517 (10th Cir. 1990) (record did not contain transcript of challenged bench ruling); *Neu v. Grant*, 548 F.2d 281, 287 (10th Cir.1977) (matters not appearing in the record on appeal will not be considered by the court of appeals).

In my view, the appendices provided by the parties are quite adequate. On that record, I would reverse the district court's denial of ASI's motion for judgment notwithstanding the verdict and remand with instruction that the judgment awarded Acrey on her ADEA claim be set aside and vacated and that ASI's motion for judgment notwithstanding the verdict be granted.

The majority opinion does not point out that Acrey's complaint filed in the district court alleged that she had been constructively discharged from her employment

with ASI on September 29, 1989, and discriminated against because of her sex, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and her age, then 50, under the ADEA. The Title VII claim was tried to the court, while the ADEA claim was simultaneously tried to a jury of six.

The district court found for ASI and against Acrey on the Title VII sex claim, after applying the three-prong analysis mandated by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The court concluded that: Acrey had failed to establish a prima facie case of sex discrimination inasmuch as the only credible evidence offered was Acrey's testimony that Eldon White, her supervisor, informed her that she did not fit the image of ASI because she was the wrong sex, which White fervently denied at trial; an isolated incident of a gender-based remark does not trigger a conclusion that discrimination occurred; there was no evidence of disparity in salaries between men and women employed by ASI; the testimony of Kouris, White and Dollinger that gender was never a factor in their dealings with Acrey was persuasive; even assuming that Acrey had met her burden of demonstrating a prima facie case of discrimination based upon her gender, still ASI had presented legitimate, non-discriminatory reasons for its actions, particularly that Acrey had not performed her duties in a satisfactory manner; Acrey was often confused, misunderstood instructions, made costly and expensive mistakes, possessed deficient interpersonal skills, and had problems conceptualizing the changes that had to be made upon the merger of American Sheep Producers Council (ASPC) and National Wool Growers Association (NWGA) which resulted in ASI; and Acrey did not meet her burden of rebutting the legitimate, nondiscriminatory reasons asserted by ASI in defense of its actions. (Brief of Appellant, Tab 1).

The district court ruled that under the evidence and the law, Acrey had failed to establish that she had been constructively discharged or discriminated against by ASI based upon her gender. *Id.* No appeal

was taken by Acrey from the district court's judgment in the Title VII action. Furthermore, no contention has been raised that the jury's findings are binding on all common issues. *See, Skinner v. Total Petroleum, Inc.*, 859 F.2d 1439 (10th Cir. 1988).

In denying ASI's motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial, the district court wrote that while its view of the evidence, which was basically identical in both causes of action, "may have been different" from that of the jury, still evidence was present in the record to support a verdict of age discrimination. (Brief of Appellant, Tab 3, p. 3). I disagree. The record simply does not contain sufficient evidence to support the jury verdict. *See Joyce v. Atlantic Richfield Co.*, 651 F.2d 676, 680 (10th Cir. 1981).

### Factual Background

Although Acrey held only a high school diploma, she attended night school and community colleges where she studied economics. She had spent some twenty-two years doing accounting work for various firms when she was hired as operations manager for ASPC on September 4, 1984, then age forty-five. Her supervisor was Ms. Rita Kourlis. Acrey testified that she oversaw all of the accounting, and in addition her responsibilities included finance and operations. She converted the manual bookkeeping system to a computerized accounting system. Acrey testified that she had a very good relationship with Kourlis, with whom she worked for a year and one-half. Rodger Wasson succeeded Kourlis for a period of about six months, and he in turn was succeeded by Eldon White, who was then director of administration.

Acrey testified that Wasson did not interact with ASPC's employee force of approximately twenty-eight and that he had a closed-door policy. She stated that during her first meeting with White, prior to the merger, he berated her for two hours and informed her of all of the things that he and Wasson disliked about her on a personal basis. White denied these allegations.

Thereafter, Acrey met with White in his office, at his suggestion, most Tuesdays at 7:00 a.m. commencing October 27, 1987, and running to March 1, 1988. Acrey testified that White was critical of her performance. White initiated the early morning meetings in order to help Acrey get along with other employees and to help her on her people skills and her performance generally.

On direct examination, Acrey stated that these early morning meetings were forced on her and that they were confrontations during which White verbally abused her. (Appellee's Supplemental Appendix to Answer Brief, Tab 5, pp. 34–35). On cross-examination, however, Acrey stated that her meetings with White had been "productive," aimed at improving her performance, and that she "very much appreciated the extra effort" made by White. *Id.*, Trial Vol. 2, pp. 136–39. Acrey stated to Larry Dollinger and Wasson that her meetings with White were very positive and that she appreciated the feedback, and she stated that White was the best manager she ever had, a genius. *Id.* Trial Vol. 5, p. 22; Trial Vol. 6, pp. 83–84. She did not complain to Dollinger or Wasson that White was picking on her or treating her differently because of her age. *Id.*

White testified that he believed that, as a result of their nine early morning meetings, he and Acrey were making significant progress in her ability to get along with other employees. (Appellant's Appendix, Trial Vol. 3, p. 90). White had become aware of Acrey's interpersonal problems by reviewing her performance records submitted by Acrey's previous supervisors, Kourlis and Wasson, and by virtue of his personal discussions with other staff members. *Id.* at 73. He testified as to Acrey's problem with the receptionist, brought about because of Acrey's abrasive mannerisms. *Id.* at 77. He had three other complaints from staff members Laurie Hansen and Jan Woodman, secretaries, and Kay Lesher, that Acrey was very authoritative and demeaning toward them. *Id.* at 78. White brought these complaints to Acrey's attention and testified that the complaints

did not stop after the early morning counseling sessions with her. *Id.* at 79.

White testified that the first part of May, 1987, he removed any responsibilities for staff oversight from Acrey because people were not comfortable with her or her abrasive nature. *Id.* at 80. He stated that Acrey was relieved when he notified her of this. *Id.* White stated that in September, 1987, he submitted a performance evaluation letter to Acrey which Acrey classed as the worst she had ever received. *Id.* at 83. When Acrey asked White whether she should quit, he told her absolutely not. *Id.* White testified that he told Acrey that he was committed to working with her on the perceptions other employees had of her, he was willing to take the time to help her, and he talked her out of resigning. *Id.* The early morning Tuesday weekly meetings resulted from that conversation. *Id.* White was not in the habit of coming to the office at 7:00 a.m., but he did so in order to help Acrey. *Id.* During one such meeting, White and Acrey completed performance evaluations of each other. Acrey rated White above average to excellent in his areas of major responsibility. *Id.* at 87. Acrey told White that he was one of the nicest supervisors she had ever worked for and that she appreciated his efforts in coming in for the Tuesday morning meetings. *Id.* at 89.

The meetings between White and Acrey stopped on March 1, 1988. White testified that he saw tremendous progress in Acrey. She had improved in her performance and was much more open and relaxed. *Id.* at 90.

At the time that Acrey tendered her resignation, there were fifteen employees reporting directly to White, eight of whom were forty years of age or older. *Id* at 48–49.

On paper, the merger between ASPC and NWGA occurred on January 24, 1989, but the mechanics of the merger were complicated. Based upon Acrey's recommendation, the accounting firm of Dollinger and Smith was hired by ASI to merge the bookkeeping departments and to set up a joint accounting system, which was Acrey's

oversight responsibility. (Appellee's Supplemental Appendix, Tab 5, p. 52). This accounting firm had audited the books and records of ASPC for three years prior to the merger, and Acrey had worked closely with Larry Dollinger. *Id.* at 62. (Appellant's Appendix, Trial Vol. 2, p. 147). Acrey recommended that the accounting firm of Dollinger and Smith be hired by ASI because it specialized in nonprofit organizations, and she testified that the firm did a good job for ASI. (Appellant's Appendix, Trial Vol. 2, pp. 147–48).

Wasson testified that after Dollinger and Smith had worked on the accounting system for several weeks, he attended a luncheon meeting with White, Larry Dollinger and John Smith, during which Dollinger and Smith related that Acrey would not be able to manage the accounting records because she did not understand the nature of the new system. (Appellant's Appendix, Trial Vol. 5, p. 27). Wasson testified that he asked Dollinger and Smith to work with Acrey so that she could get up to speed. *Id.*

Acrey testified that on February 8, 1989, White called her to his office and asked why she did not quit. In response, Acrey questioned why "they didn't fire me." She stated that White replied that he did not have grounds to fire her, but that she was "too old ..., the wrong sex ..., the wrong religion ..., too liberal and ... didn't fit the image they wished to project and they wanted [her] to resign." (Appellant's Appendix to Opening Brief, Tab 6, p. 55). White denied making these remarks.

The testimony of Larry Dollinger, John Smith and Paul Zulauf, all certified public accountants (with Dollinger and Smith), was, in summary, that: Acrey was not performing her work satisfactorily following the merger because the accounting system had become too complex for her; Acrey's prior work involved simple debits and credits, bookkeeping procedures; the new accounting system, known as Solomon, required a theoretical background in accounting which Acrey lacked; Acrey had difficulty accumulating the detail on the assets associated with NWGA and under-

standing the capabilities of the new system; Acrey encountered difficulties in making journal entries to reflect cash receipts and in designating the restricted and unrestricted funds; Acrey did not understand the dynamics of the deferred membership billings from the NWGA; and following the merger, an accrual method of accounting was implemented which required inventory control, depreciation schedules, restricted funds, negative goodwill and other complex accounting procedures which Acrey lacked the experience or knowledge to handle/perform. Mr. Zulauf, then age 27, was hired by ASI to replace Acrey in August, 1989. (Appellant's Supplemental Appendix, Tab 5, p. 48).

The testimony of Dollinger, Smith, and Zulauf was not controverted. However, Acrey testified that she was not given any training relative to the new accounting system or any opportunity to perform under it.

Following the merger, it was determined that ASI would move from the Clayton Street location. Acrey misread the lease and informed Wasson that only a 30–day notification of cancellation to the lessor was required, while in fact the lease required a six-month notification. This error cost ASI some $10,068.75. Wasson requested that Acrey provide him with a salary schedule of employees which he required for review by the financial review committee. Acrey did not provide accurate information, and Wasson was required to employ the accounting firm of Dollinger and Smith to obtain correct information. Acrey was administrator of the employee pension plan. In June, 1989, she forged the name of ASI employee Jackeye Dunn on a loan document submitted to United Bank of Cherry Creek, where Dunn was listed as Assistant Plan Administrator. Dunn was not the Assistant Plan Administrator. Acrey acknowledged that she forged the signature. In August, 1989, Acrey failed to make a timely pension contribution on behalf of ASI. When Wasson confronted Acrey, in the presence of White, with this problem and the error regarding notice for termination of the Clayton Street lease, Acrey asked if she should resign and Was-

son responded that she should not. (Appellant's Appendix, Trial Vol. 5, p. 34).

On rebuttal, Acrey called a Ms. Fay, then age 59, who testified that: she had worked for ASPC under the supervision of Eldon White; White refused to give her merit raises for three consecutive years and he made her working conditions intolerable; when she complained to Wasson, he gave her the option of quitting or being fired; she was then age 54; and she acknowledged that both Richard Hasland and Rick Wertheimer, for whom she performed secretarial work, were critical of her job performance. White testified that he had not harassed Ms. Fay and had not forced her to resign.

### Conclusion

I would hold that the district court erred in denying ASI's motion for judgment notwithstanding the verdict. The record demonstrates beyond doubt that ASI articulated a legitimate, non-discriminatory business reason for its handling of Acrey in that, on the date of her resignation, Acrey's job performance was unsatisfactory. Acrey did not prove by a preponderance of the evidence that the proffered reason was a mere pretext for age discrimination. The jury's verdict is unsupported by the record.

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), provide for a three-stage analysis in determining whether a plaintiff has sustained his/her burden of proof in an employment discrimination case. First, the plaintiff has the initial burden of establishing a prima facie case of discrimination. Second, if the plaintiff should establish a prima facie case, the burden then shifts to the defendant employer to establish some legitimate, non-discriminatory reason for its actions. Third, if the defendant employer does offer a legitimate, non-discriminatory reason, the plaintiff must then prove by a preponderance of the evidence that the reason proffered by the employer was a mere pretext for discrimination.

The ADEA prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In order to establish a prima facie case of age·discrimination by constructive discharge, an employee must prove that his "employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Derr v. Gulf Oil Corp.,* 796 F.2d 340, 344 (10th Cir.1986).

*Derr* holds that one cannot establish a prima facie case of age discrimination by constructive discharge absent evidence that an employer subjected the employee to difficult or intolerable working conditions. *Id.* In the instant case, the jury determined that Acrey had been constructively discharged by ASI, her age was a determinative factor, and the discharge constituted a willful violation of ADEA.

In the Title VII action, the trial court, based on the same evidence considered by the jury in the ADEA action, found that Acrey had not established a prima facie case of sex discrimination. The trial court found:

The only credible evidence offered suggesting gender-based discrimination was the alleged statement made by Mr. White that Ms. Acrey did not fit the image of ASI because she was the wrong sex. At trial, Mr. White fervently denied making this statement. Even if we were to assume that this utterance was made, such a remark does not prove that plaintiff was discriminated against based upon gender. *Price Waterhouse v. Hopkins,* [490 U.S. 228, 251,] 109 S.Ct. 1775, 1791[, 104 L.Ed.2d 268] (1989). An isolated incident of a gender-based remark does not trigger a conclusion that discrimination occurred. *Ottaviani v. State University,* 875 F.2d 365, 369, 375–76 (2d Cir. 1989), *cert. denied,* [493 U.S. 1021,] 110

S.Ct. 721[, 107 L.Ed.2d 740] (1990); *see Hicks,* [*Hicks v. Gates Rubber Co.,* 833 F.2d 1406 (10th Cir.1987) 833 F.2d at 1412; *see Miller v. Aluminum Co. of America,* 679 F.Supp. 495, at 502 (1988). No other credible testimony was offered to support a finding of sex discrimination. We are persuaded by the testimony of Ms. Kourlis, Mr. White, and Mr. Dollinger which indicated that plaintiff's gender was never a factor in their dealings with her. It is significant that the evidence does not reflect disparities in salary between men and women, suggesting that gender-based discrimination was not present. *Brownlee v. Gay & Taylor, Inc.,* 861 F.2d 1222, 1225 (10th Cir.1988); *Willner v. University of Kansas,* 848 F.2d 1023, 1031 (10th Cir.1988), *cert. denied,* 488 U.S. 1031[, 109 S.Ct. 840, 102 L.Ed.2d 972] (1989).

(Appellant's Appendix to Opening Brief, Tab 7, pp. 5–6).

The trial court did not rest on its determination that Acrey had not met her burden of proof under *McDonnell's* first prong. On the assumption that Acrey had met her burden there, the trial court found:

> [D]efendant has offered some legitimate, non-discriminatory reason for its actions. Plaintiff was not performing her duties in a satisfactory manner. *Trujillo v. Grand Junction Regional Center,* 928 F.2d 973, 977 (10th Cir.1991); *Alexander v. Gardner–Denver Co.,* 519 F.2d 503 (10th Cir.1975), *cert. denied,* 423 U.S. 1058[, 96 S.Ct. 793, 46 L.Ed.2d 648] (1976). Testimony revealed that plaintiff was often confused and misunderstood instructions. She made costly and expensive errors. Her interpersonal skills were deficient. She was described as hostile, autocratic, and harsh. She had problems conceptualizing the changes that would have to [be] made upon the merger of the two organizations.
>
> Finally, plaintiff did not meet her burden and rebut the asserted legitimate, nondiscriminatory reasons for ASI's actions. *Brownlee,* 861 F.2d at 1224. She merely asserted that her performance was satisfactory. She never made any effort to show that the legitimate, non-discriminatory reason for defendant's conduct was

a mere pretext, facade, or sham for discrimination. *Ramsey,* 907 F.2d at 1010. [*Ramsey v. City and County of Denver,* 907 F.2d 1004 (10th Cir.1990), *cert. denied,* —— U.S. ——[, 113 S.Ct. 302, 121 L.Ed.2d 225] (1992) ]. Her failure to address by credible evidence defendant's reason for its conduct necessitates a finding that her burden has not been met. *See Cooper v. Cobe Laboratories, Inc.,* 743 F.Supp. 1422, 1431 (D.Colo.1990). Under the evidence and under the law, we conclude plaintiff has failed to establish that she was constructively discharged or discriminated against based upon her gender.

*Id.* at pp. 6–7.

I would hold that the trial court's findings are equally applicable to Acrey's ADEA claim. The trial court recognized that the jury found that Acrey had been constructively discharged under the age (ADEA) claim, but nevertheless, as trier of fact in the Title VII gender claim, the court concluded:

> However, under our view of the evidence, plaintiff has failed to establish by a preponderance of the evidence the defendant's action made working conditions so difficult that a reasonable person in her position would feel compelled to resign. *Ramsey v. City and County of Denver,* 907 F.2d 1004, 1010 (10th Cir. 1990).

*Id.* at p. 4.

Inexplicably, the trial court, in denying ASI's motion for judgment notwithstanding the verdict, while recognizing that "much of the evidence that supported the sex discrimination claim also supported the age discrimination cause of action," nevertheless concluded that "evidence was present in the record to support a verdict of age discrimination." *Id.,* Tab 4, pp. 2–3. I disagree. The trial court, without identifying any evidence in support thereof, concluded that "[w]hen viewing the evidence as a whole and viewing in the light most favorable to support the jury's verdict, we believe that plaintiff has met her burden of proof on the age discrimination claim." *Id.* at p. 4.

When ASI produced evidence of a legitimate, nondiscriminatory business reason for its conduct, it became Acrey's obligation to prove that ASI's proffered justification was "a mere pretext for discrimination." *Connecticut v. Teal*, 457 U.S. 440, 447, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982). A pretext can be established "by showing that the employer's proffered explanation is unworthy of credence." *Mitchell v. Mobil Oil Corp.*, 896 F.2d 463, 471 (10th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 252, 112 L.Ed.2d 210 (1990); *Krause v. Dresser Industries, Inc.*, 910 F.2d 674, 677 (10th Cir.1990); *EEOC v. University of Oklahoma*, 774 F.2d 999, 1002 (10th Cir.1985), *cert. denied*, 475 U.S. 1120, 106 S.Ct. 1637, 90 L.Ed.2d 183 (1986). In *Merrick v. Northern Natural Gas Co.*, 911 F.2d 426, 430 (10th Cir.1990), we observed that after the employer presented evidence of a legitimate, non-discriminatory reason for Merrick's termination, Merrick failed to introduce evidence giving rise to a genuine issue of material fact showing that the employer's reasons were pretextual. The same vacuum exists in the instant case.

ASI's evidence that Acrey's post-merger work performance was unsatisfactory was not rebutted. To be sure, Acrey testified and presented the testimony of other witnesses that she had performed her work satisfactorily prior to the merger. Following the merger, however, the situation changed dramatically. The testimony of certified public accountants Dollinger, Smith and Zulauf, combined with that of White and Wasson, was uncontroverted on the point that Acrey was not able to perform her accounting work following the merger because the system was too complex for her. Acrey testified that after the merger she was not permitted to attend meetings with the accountants about setting up the new system (Appellee's Supplemental Appendix to Answer Brief, Tab 5, p. 96) and she had not been given any training on the new Solomon system. *Id.* at 98. Mr. Paul Zulauf, senior auditor, testified that prior to putting the new accounting system into effect on July 1, 1989, he met with Acrey two or three times a week

concerning the project (*id.*, p. 39), and he, Dollinger, and Smith concluded that because Acrey's experience had been in bookkeeping rather than accounting, she would not be able to manage the new accounting system. *Id.* at 46.

In *EEOC v. Sperry Corp.*, 852 F.2d 503, 507 (10th Cir.1988), we held that an ADEA plaintiff must establish that age was a "determining factor" in the employer's challenged action. *See also Lewis v. City of Ft. Collins*, 903 F.2d 752, 755 n. 1 (10th Cir.1990). We explained in *E.E.O.C. v. Prudential Fed. Sav. & Loan Ass'n.* and *Cooper v. Asplundh Tree Expert Co.* that while a plaintiff need not prove that age was the *sole* reason for the employer's acts, the plaintiff must show that age "made a difference" in the employer's decision. 763 F.2d at 1170; 836 F.2d at 1547. In *Cooper*, we held that while a basic finding of liability under the ADEA requires only that age be at least one of the "determinative factors" in the employer's conduct, in order to establish a willful violation, it is necessary to prove that age discrimination was the "predominant factor" in the employer's decision. 836 F.2d at 1551.

There is no evidence in the record demonstrating that, given the complexity of the new accounting system and the efforts made to improve her performance, ASI discriminated against Acrey on account of her age. On the other hand, there is overwhelming evidence that Acrey's job performance was not satisfactory following the implementation of the new accounting system. I conclude that, under these circumstances, Acrey's ADEA claim must fail as a matter of law. There is a lack of evidence in the record to support the jury's verdict. *Colorado Coal Furnace Distribs. v. Prill Mfg. Co.*, 605 F.2d 499, 502 (10th Cir.1979). In *Fallis v. Kerr–McGee Corp.*, 944 F.2d 743, 747 (10th Cir.1991), this court pertinently observed:

Under the law of this circuit, even if the jury chose to believe plaintiff's assessment of his performance rather than Kerr–McGee's, that choice, standing alone, does not permit a conclusion that

Kerr–McGee's version was a pretext for age discrimination. *See Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988) ("As courts are not free to second guess an employer's business judgment, this assertion [that plaintiff was equally or more qualified than the people retained] is insufficient to permit a finding of pretext."). This circuit's view is that a plaintiff cannot prevail by merely challenging in general terms the accuracy of a performance evaluation which the employer relied on in making an employment decision without any additional evidence (over and above that of the prima facie case) of age discrimination. *See id.* citing *Kephart v. Institute of Gas Technology*, 630 F.2d 1217, 1233 (7th Cir.1980); *accord Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1508 (5th Cir.1988).