FILED
United States Court of Appeals
Tenth Circuit

February 24, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CAROLE STRICKLAND,

   Plaintiff - Appellant,

v.

UNITED PARCEL SERVICE, INC., a
Delaware corporation,

   Defendant - Appellee.

No. 07-1082

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 04-CV-1395-RPM)**

---

Hollie L. Wieland, Sears & Swanson, P.C., Colorado Springs, Colorado, for
Plaintiff-Appellant.

Jim Goh (Emily Hobbs-Wright with him on the brief), Holland & Hart LLP,
Denver, Colorado, for Defendant-Appellee.

---

Before **MURPHY**, **McKAY**, and **GORSUCH**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

   Plaintiff-Appellant Carole Strickland brought various state and federal

claims against Defendant-Appellee United Parcel Service, Inc. ("UPS") after she

stopped working for UPS. The only claims at issue in this appeal are claims of retaliation for utilizing the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654, and sex discrimination. After Strickland presented her case at trial, the district court granted judgment as a matter of law to UPS on both claims. The district court ruled Strickland's FMLA retaliation claim failed as a matter of law because she could not prove constructive discharge since she testified she did not intend to quit when she stopped working. The district court also ruled there was no basis for an inference of sex discrimination because a female co-worker was not subject to the same mistreatment as Strickland. Strickland appeals these rulings. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we **reverse** the district court on both claims and **remand** for a new trial on Strickland's FMLA retaliation and Title VII sex discrimination claims.

## I. Background

Strickland began working for UPS as a temporary driver in 1999. She later became a permanent driver and, one year later, a salesperson. In January 2002 she was promoted to key account executive and began working under the supervision of Troy Roten.

In the fall of 2002 Strickland broke up with her long-term boyfriend. Roten believed she looked stressed and encouraged her to seek assistance through UPS's employee assistance program. Strickland testified Roten suggested she take leave to work through her personal issues. Strickland stated she did not want to go on

leave, but Roten pushed for it and she eventually relented. Strickland was on leave for approximately two weeks.

The day Strickland returned from leave, Roten met with her and asked her repeatedly whether she was "100 percent" and ready to work. Immediately following this meeting, she met with Roten and the district manager, Jack Donnell. Donnell discussed Strickland's sales plan, telling her "it was unacceptable, and things needed to change, and [how she] had really let him down."

Strickland contends she was subject to increased oversight for the remainder of her tenure at UPS. She was required to attend frequent meetings and participate in phone calls with Roten and Donnell regarding her sales performance. Strickland claims the tone of these meetings was negative, with Roten warning he would get Donnell involved and Donnell saying she had let the company down. She testified the meetings interfered with her ability to do her job because they took place during selling hours and sometimes required her to drive from Colorado Springs to Englewood. Strickland was told she was required to be at 100% of all sales quotas. She was also required to sign written commitments as to which accounts she would win and was criticized for not meeting the commitments. In addition, Strickland claims Roten ignored her requests for assistance, telling her at one point he would rather help salespersons who wanted to be successful. Co-workers testified that Roten refused to answer

-3-

Strickland's questions during sales meetings, although he answered questions of other sales representatives.

During a December 2002 meeting with Roten, which Donnell attended via telephone, Strickland complained she was being singled out since other employees with similar numbers were not subject to the meetings and the constant performance evaluations. Roten and Donnell became irate when she made this allegation. During this meeting Strickland also said she would like to be able to speak directly to Donnell without going through Roten. Donnell told her she was permitted to do so under the company's open door policy. After the meeting, Roten exploded, accusing Strickland of questioning his authority and telling her she was not permitted to speak with Donnell directly, notwithstanding the open door policy.

Three days later, Strickland sent an e-mail to Roten, Donnell, and a human resources representative detailing why she felt singled out following her return from leave. She also contacted Kelly Delph, an employee in the human resources department, who told Strickland she would prepare a formal write-up. Strickland was later informed by Delph that nothing had been done to investigate her complaints. Strickland also asked about the possibility of a transfer and was told by Donnell she was not eligible for a transfer because transfers were only available to "successful" employees.

Strickland was not the only UPS employee who testified that Roten was a difficult supervisor. One male co-worker described Roten's managerial style as "management by fear" and detailed instances when Roten challenged his veracity and disciplined him without permitting an explanation. Another described Roten as a micro-manager. One individual, David Bishop, left UPS early in 2002. He testified he left because he felt singled out by Roten and subject to intense oversight after he returned from a temporary leave of absence due to work-related stress.

Multiple co-workers also testified, however, that Strickland was treated differently from everyone else. At the end of 2002 Strickland was between 93% and 104% of her sales quotas and was outperforming at least some of her co-workers on every measure. Strickland's co-workers were not required to attend individual meetings with Roten and Donnell or make written sales commitments even though no one was at 100% of every sales quota. One male co-worker, Paul Deaton, trailed Strickland in almost every sales measure but was not required to attend meetings to discuss his performance, was not denied assistance, and was not counseled for failing to reach 100% in every sales measure. After Strickland returned from her two-week leave of absence, she had five male co-workers and one female co-worker. The female co-worker, Penny Harper, testified she was not treated differently than the male employees, but Strickland was.

On January 15, 2003, Strickland went into Roten's office, turned in her company laptop, and informed him she was leaving. At trial, she was questioned at length regarding her state of mind at the time she stopped working. She testified she was "done," "at her wits end," and unwilling to return to that environment. She said she had no intention of returning to work for Roten. She did, however, hope to return to work for UPS in a different capacity. Strickland also testified that when she stopped working she did not believe she had "quit," "resigned," or "terminated" her employment. She also stated she did not intend at that time to end her employment relationship with UPS, and she characterized her action as "going out on a leave."

Strickland never returned to work at UPS, although in May 2003 she communicated with UPS about returning. She was offered a sales position in Denver reporting to a different supervisor. She declined this offer because UPS could not guarantee Roten would not be transferred to that facility and the position would require a longer commute. Over a year after Strickland stopped working, she was administratively terminated by UPS.

Strickland filed suit against UPS, and the parties went to trial on the following claims: retaliation for Strickland's use of medical leave, in violation of the FMLA, 29 U.S.C. § 2615 (as interpreted at 29 C.F.R. § 825.220(c)); sex discrimination, in violation of Title VII of the Civil Rights Act, 42 U.S.C.

§ 2000e-2(a)(1);[1] retaliation for opposition to sex discrimination, in violation of § 2000e-3(a); breach of contract; and breach of the covenant of good faith and fair dealing.[2] She sought damages including, *inter alia*, lost wages. After Strickland presented her case the district court granted judgment as a matter of law to UPS on all claims. As for the FMLA retaliation claim, the district court ruled Strickland could not prove damages because she testified she did not quit working for UPS. Since she testified she did not quit, she could not show she was constructively discharged, which was necessary to sustain her claim for damages. The district court also granted judgment as a matter of law on the sex discrimination claims based on Penny Harper's testimony that Harper was not treated differently by Roten. The district court concluded there was no basis for an inference of sex discrimination. Strickland appeals the district court's judgment with respect to the FMLA retaliation and sex discrimination claims.

---

[1]Although Strickland and the district court described Strickland's Title VII claims as "gender" discrimination, this court uses the term "sex discrimination" when discussing her claims because the statute upon which she relies prohibits discrimination on the basis of sex. 42 U.S.C. § 2000e-2(a)(1).

[2]Strickland does not appeal the grant of judgment as a matter of law on her claims for retaliation for opposing sex discrimination, breach of contract, and breach of the covenant of good faith and fair dealing.

## II. Discussion

*A. FMLA Claim.*

The district court granted judgment as a matter of law to UPS at the close of Strickland's case. As to Strickland's FMLA claim, the court ruled she had failed to prove damages because she could not show a constructive discharge. A district court's decision to grant judgment as a matter of law is reviewed de novo. *Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1175 (10th Cir. 2008). When reviewing a decision de novo, this court applies the same standard applied by the district court. *Riske v. King Soopers*, 366 F.3d 1085, 1088 (10th Cir. 2004). A district court may only grant judgment as a matter of law when a reasonable jury would have no legally sufficient evidentiary basis to rule in favor of the nonmoving party. Fed. R. Civ. P. 50(a)(1). Judgment as a matter of law is only appropriate "if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." *Riske*, 366 F.3d at 1088-89 (quotation omitted).

The FMLA only permits the recovery of actual monetary losses, which in this case would be lost wages. *Walker v. United Parcel Serv., Inc.*, 240 F.3d 1268, 1277-78 (10th Cir. 2001). Strickland did not stop working because she was terminated, so to recover damages in the form of lost wages, she must demonstrate she was constructively discharged. *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 342-43 (10th Cir. 1986). Constructive discharge occurs when an employer

-8-

unlawfully creates "working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign." *Fischer v. Forestwood Co.*, 525 F.3d 972, 980 (10th Cir. 2008) (quotation omitted). The plaintiff's burden is substantial. *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 805 (10th Cir. 2007). The standard is objective: the employer's subjective intent and the employee's subjective views on the situation are irrelevant. *Id.* Whether a constructive discharge occurred is a question of fact. *Arnold v. McClain*, 926 F.2d 963, 966 (10th Cir. 1991).

The district court granted judgment as a matter of law because it concluded Strickland did not intend to terminate her employment when she stopped working.[3] Parts of her testimony supported such a finding. Other parts of her testimony, however, revealed ambiguity on the issue. Strickland testified she would not return if she had to work for Roten. She also testified she was "done" and "at her wits end."

The existence of constructive discharge is an issue of fact to be resolved by the jury, and judgment as a matter of law is only appropriate if the evidence is susceptible to but one interpretation. *Riske*, 366 F.3d at 1088-89. The testimony

---

[3]Strickland argues her subjective intent as to whether she was permanently quitting or temporarily taking leave is irrelevant, since the standard for constructive discharge is objective. In light of our holding that the evidence could support a finding of intent to quit, we leave open the question of whether a subjective intent to quit is a necessary element of constructive discharge. *See, e.g., White v. Honeywell, Inc.*, 141 F.3d 1270, 1279-80 (8th Cir. 1998).

here is susceptible to multiple interpretations. A jury could find Strickland intended only to take temporary leave. On the other hand, a jury could alternatively find she left UPS with no intention of returning to work under Roten. While she expressed a hope that UPS would offer her a different position where she would have no contact with Roten, such a hope did not necessarily negate her intent to permanently stop working in her former position. Since the evidence could have been interpreted by a reasonable jury in Strickland's favor, the district court erred in granting judgment as a matter of law to UPS on the issue of constructive discharge.

UPS argues the district court's ruling can be affirmed on alternative grounds. First, UPS claims the conditions at work were not so bad as to be intolerable. Second, UPS claims Strickland was objectively unreasonable in refusing UPS's offer to let her return in a different position where she would not be reporting to Roten.

As for the first contention, whether the conditions at UPS were objectively intolerable is a question of fact for the jury. *Arnold*, 926 F.2d at 966. Strickland put on sufficient evidence to support a finding of constructive discharge. The conditions to which she was subjected are similar to conditions considered by this court in *Acrey v. American Sheep Industry Ass'n*, 981 F.2d 1569, 1574-75 (10th Cir. 1992). In *Acrey*, the plaintiff believed her job was in jeopardy, she had been confronted by her supervisor with performance shortcomings, job responsibilities

had been taken away from her, and "she received inadequate information and training to perform her . . . duties." *Id.* at 1574. The court held the plaintiff presented sufficient evidence to support a constructive discharge claim. *Id.* at 1575. Here, Strickland did not have job responsibilities taken from her, but she did believe her job was in jeopardy, she was repeatedly told by her supervisors her performance was unacceptable, and she was not provided support to perform her job when she requested it. In addition, her supervisors forced her to make written "commitments" to win certain contracts, which in her view was a deliberate attempt to set her up to fail. She testified her meetings with supervisors to discuss her performance interfered with her ability to do her job. Roten exploded when she tried to take advantage of the company's open door policy and effectively told her she could not utilize the policy. She was held to higher standards than her co-workers. Finally, she attempted to improve her situation by filing an internal complaint and requesting a transfer, but neither action was helpful. This evidence, viewed in the light most favorable to Strickland, suggests a workplace more intolerable than the workplace in *Acrey*, and UPS is not entitled to judgment as a matter of law on this basis.

The availability of the alternative job relates to the question of whether a reasonable employee would have felt compelled to leave UPS. *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135-36 (10th Cir. 2004). The most obvious problem with UPS's suggestion that the alternative job offer made Strickland's

-11-

decision unreasonable is that the offer was not tendered until four months after Strickland stopped working. A reasonable person, at the time Strickland left UPS, would not have been able to consider this alternative. Additionally, the new position would have required a longer commute for Strickland and offered no guarantee that she would not work for Roten. A rational jury could find this to be an unrealistic option, and therefore judgment as a matter of law was improper on these grounds as well.

*B. Sex Discrimination Claim.*

Strickland also appeals the district court's grant of judgment as a matter of law to UPS on her sex discrimination claim.[4] In support of her claim, she elicited testimony from co-workers, both male and female, who stated she was treated differently from everyone else. This included testimony from one male co-worker, Paul Deaton, who trailed Strickland in nearly every sales measure but was

---

[4]Strickland appears to have proceeded under two separate Title VII theories: disparate treatment and hostile work environment. To prove her disparate treatment claim, Strickland must show she suffered an adverse employment action because of her sex. *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005). As discussed above, she has presented evidence of constructive discharge and constructive discharge is an adverse employment action. *Fischer v. Forestwood Co.*, 525 F.3d 972, 980 (10th Cir. 2008).

To prove a hostile work environment claim, she must show her workplace was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005) (quotation omitted). Because the district court concluded a jury could not infer Strickland was treated differently based on her sex, it did not specifically address her hostile work environment claim.

not subjected to the same treatment as Strickland, including the individualized meetings to discuss performance, the lack of support, and the requirement of being at 100% on all sales goals. Strickland had only one female co-worker, Penny Harper. Harper testified she was not treated differently from the males in the office, but Strickland was treated differently. On the basis of Harper's testimony, the district court granted judgment as a matter of law to UPS. The district court reasoned that since Harper was not treated differently, the jury could not infer Strickland's alleged mistreatment was due to her sex. Although not relied upon by the district court, on appeal UPS also points out that Bishop, a male former co-worker of Strickland, left the company some months earlier under similar pressure from Roten. Additionally, Strickland's male co-workers complained of Roten's managerial style. This evidence, UPS argues, further demonstrates that males and females were treated similarly, thus negating Strickland's sex discrimination claims.

A sex discrimination claim does not fail simply because an employer does not discriminate against every member of the plaintiff's sex. *Pitre v. W. Elec. Co.*, 843 F.2d 1262, 1272-73 (10th Cir. 1988). While Harper's treatment might be relevant to the issue of UPS's intent, it does not resolve the issue as a matter of law. Paul Deaton was similarly situated to Strickland and had worse sales numbers, yet he was not subject to the same requirements and oversight as

Strickland.[5]  From this evidence the jury could have found that Strickland was subjected to sex discrimination notwithstanding Harper's testimony that Roten did not treat her differently.  The district court erred, therefore, in granting judgment as a matter of law to UPS on the Title VII sex discrimination claims on that basis.

The evidence UPS cites regarding the treatment of Strickland's male co-workers also does not compel judgment as a matter of law.  Even though the male co-workers complained of Roten's managerial style, they and others also testified Strickland was treated differently from every male employee Roten supervised.[6]  Bishop is the only male employee who was subjected to treatment approaching what Strickland experienced.  While his testimony, like Harper's, may undermine Strickland's sex discrimination claim, it does not defeat that claim as a matter of

[5]The dissent argues that Strickland compared herself to Deaton only in her reply brief and that Deaton was not similarly situated to Strickland because he was located in a different office.  Dissenting Op. 2-3.  While Strickland did not refer to Deaton by name in her opening brief, she cited Deaton's testimony for the proposition that "similarly situated sales representatives with similar or lower sales had no such requirement [to be counseled regarding sales performance]." Aplt.'s Br. 8.

For its part, UPS argued Deaton was a "similarly-situated male employee" who was not treated differently from Strickland.  Appellee's Br. 20-21.  UPS therefore effectively conceded that Deaton and Strickland were similarly situated.

[6]The dissent fails to acknowledge this evidence in concluding the record lacks "any evidence suggesting that Mr. Roten treated Ms. Strickland less favorably than any other male employee he supervised."  Dissenting Op. 4.  To the contrary, in response to the question of whether Roten "treated women differently than he treated male employees," Joe Napikoski stated, "I know he treated Carole differently than he treated us."  Deaton, despite having lower sales figures than Strickland in nearly every measure, testified he was not counseled or required to attend individual meetings regarding his sales performance.

law in light of other testimony that she was treated worse than her male co-workers, including Deaton, who had inferior sales numbers. *Id.* at 1272 ("[A]n employer is not immunized from liability simply because some males received detriments before or contemporaneously with a Title VII plaintiff."). Therefore, the district court erred in preventing Strickland's sex discrimination claim from going to the jury.

### III. Conclusion

Because Strickland created a triable issue of fact as to whether she was constructively discharged, her FMLA retaliation claim should have been submitted to the jury. Likewise, the evidence she was treated worse than her male co-workers was sufficient to require that her sex discrimination claim go to the jury. The judgment of the district court is therefore **reversed** and **remanded** for a new trial on Strickland's FMLA retaliation and sex discrimination claims.

07-1082, *Strickland v. United Postal Service*

**GORSUCH, J.,** Circuit Judge, concurring in part and dissenting in part.


I admire and concur entirely in my colleagues' thoughtful treatment of Ms. Strickland's FMLA claim, and am pleased to join Parts I and II.A of the court's opinion. With respect to the gender discrimination claim discussed in Part II.B, I would affirm the judgment of the district court.

To establish a prima facie case of gender discrimination in violation of Title VII, a plaintiff must establish, among other things, that the adverse action complained of occurred "under circumstances which give rise to an inference of unlawful discrimination." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Ms. Strickland sought to establish an inference of discrimination from circumstantial evidence – by showing that Mr. Roten treated similarly situated male employees better than her. This, of course, she was entitled to do. The difficulty is that the record in this case shows that Mr. Roten harassed male employees in very much the same manner as he harassed Ms. Strickland.

In her opening brief, Ms. Strickland devotes her discussion section to arguing that Mr. Roten treated Joe Napikoski, a similarly situated male employee, more favorably than her. But Mr. Napikoski testified that Mr. Roten "manage[d] by fear," and that "after three or four months of working for Troy [Roten],

literally every day I came to work I didn't know if I was going to leave that day with my job or not." App. at 43. He further testified that Mr. Roten was a "very demanding manager," who was "prone to micromanagement" and who "closely monitor[ed]" Mr. Napikoski and accused him of insubordination. *Id.* at 67-68. In fact, the "entire sales team," Mr. Napikoski explained, met with Mr. Roten's boss "just to describe our frustration and give him specific examples of why we felt the way we did." *Id.* at 46. Mr. Napikoski didn't think Mr. Roten was singling him out. Far from it. "I think he probably did this to everybody," he testified. *Id.* at 74.[1]

---

[1] The majority points to Joe Napikoski's statement that, "I know [Mr. Roten] treated Carole differently than he treated us." Maj. Op. at 14 n.6. But this statement followed a lengthy discussion by Mr. Napikoski of how differently Ms. Strickland was treated *when she came back from FMLA leave*. Mr. Napikoski was asked if, when Ms. Strickland returned from her leave, "she [was] treated differently than before she went out on leave?" To which he replied, unequivocally, "Yes. . . . The effort was to, in my opinion, was to, you know, make or break, you know, provide so much additional stuff that she had to do, and so much torment that she would just eventually walk out. . . . It was almost like they were mad that she had taken advantage of the company by taking some time off with pay. It's almost how dare you." App. at 51-52; *see also id.* at 53. That Mr. Napikoski would, shortly after this discussion, state that Ms. Strickland was treated differently than other employees is simply consistent with her claim that she was retaliated against for taking FMLA leave. It does not, taken in context, suggest that her mistreatment occurred "under circumstances which give rise to an inference of unlawful discrimination" on the basis of gender. *Kendrick*, 220 F.3d at 1227 (quoting *Burdine*, 450 U.S. at 253).

Underscoring this point, Mr. Napikoski testified that two other males and one other female from their group took FMLA leave. He explained that the two males who took leave for stress-related reasons, like Ms. Strickland, were both

(continued...)

-2-

In the discussion section of her reply brief before us, Ms. Strickland shifts course. Perhaps recognizing the difficulty of claiming that Mr. Napikoski received more favorable treatment from Mr. Roten, Ms. Strickland asks us to consider Paul Deaton. Ms. Strickland argues, and my colleagues agree, that Mr. Deaton "had worse sales numbers [than Ms. Strickland], yet he was not subject to the same requirements and oversight as [Ms.] Strickland." Maj. Op. at 13-14. But Mr. Deaton was stationed in Pueblo, approximately fifty miles south of Colorado Springs, and thus had "limited" interactions with the Colorado Springs office where Mr. Roten worked. App. at 171-72. Because Mr. Deaton's appearances at the Colorado Springs center were infrequent – anywhere between once a month and once a quarter – he is a poor yardstick for comparison to Ms. Strickland, who worked closely by Mr. Roten in Colorado Springs. *Id.* at 172; *see Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) ("Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline. A court

---

[1](...continued)
treated very unfavorably on their return. App. at 58-59. Meanwhile, the female took leave because she was pregnant, and it was "very clear" to Mr. Napikoski that "it was a total different situation whenever someone went out on FMLA for a pregnancy . . . . [I]t was very seamless." He continued: "it was totally different if you happened to go out on FMLA for work stress related situations." *Id.* at 59. Viewed in its entirety, Mr. Napikoski's testimony thus surely suggests Mr. Roten discriminated against those who took FMLA leave for stress-related reasons he considered inappropriate, but it simply does not support any reasonable inference of discrimination on the basis of gender.

should also compare the relevant employment circumstances . . . applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated.") (internal citation and quotation omitted).

Despite the cushion of distance, however, the record shows that Mr. Roten still subjected Mr. Deaton to much the same harassing oversight he imposed on Ms. Strickland and other employees. Mr. Roten would email and call Mr. Deaton several times a day, and would go on "ride-alongs" with him. App. at 172-73, 175-76. Mr. Roten was a "micromanager," Mr. Deaton testified, that "just want[ed] details on things" and "would just stay after you constantly." *Id.* at 173, 175. Mr. Roten would require Mr. Deaton, like everyone else, to submit weekly calenders, a requirement which Mr. Deaton tried to follow through on so that he "wouldn't have to go through any crud with [Mr. Roten]." *Id.* at 174. In the end, Mr. Deaton testified, he was "glad that [he] was south of the Springs," in Pueblo. *Id.* at 176. Far from showing that Mr. Deaton was a similarly situated male treated more favorably than Ms. Strickland, the record thus shows that, despite not being at the same facility as Mr. Roten, Mr. Deaton was subjected to the same harassing style of management as Ms. Strickland.[2]

_____

[2] In her reply brief, Ms. Strickland summarily states, in one sentence, that Don Stephas was also a similarly situated male employee who was treated more favorably by Mr. Roten. It is difficult to evaluate this conclusory statement that includes no supporting rationale or citations to the record. *MacArthur v. San Juan County*, 495 F.3d 1157, 1160-61 (10th Cir. 2007) ("[M]ere conclusory
(continued...)

Given all this, the record could certainly suggest to a reasonable factfinder that Mr. Roten treated Ms. Strickland poorly in retaliation for her decision to exercise her FMLA rights (as the plaintiff argues and we hold today), or that Mr. Roten was a difficult and unpleasant manager to males and females alike (bad for business, but not legally actionable either), or perhaps that Mr. Roten treated Ms. Strickland as he did because she performed poorly (as the defendant claims). What's missing from the record, however, is any evidence suggesting that Mr. Roten treated Ms. Strickland less favorably than any other male employee he supervised.

Certainly, as the court rightly notes, we held in *Pitre v. Western Elec. Co., Inc.*, 843 F.2d 1262 (10th Cir. 1988), that the fact that similarly situated males were treated just as poorly as a female plaintiff, or the fact that other women were treated more favorably than the plaintiff, does not necessarily "preclude the district court from finding a statutory violation." *Id.* at 1273. But this undisputed principle does not obviate the requirement that Ms. Strickland come forth with *some* direct or circumstantial evidence suggesting that Mr. Roten's treatment of her arose "under circumstances which give rise to an inference of unlawful

---

[2](...continued)
allegations with no citations to the record or any legal authority for support does not constitute adequate briefing."). In any case, the record does reveal that Mr. Stephas, like Mr. Deaton, was situated at a location apart from Colorado Springs (seventy miles away in Denver), and yet was subjected to much the same strict scrutiny from Mr. Roten as Ms. Strickland. *See* App. at 183-84.

discrimination." *Kendrick*, 220 F.3d at 1227 (quoting *Burdine*, 450 U.S. at 253). Such evidence was plentiful in *Pitre*, where the class plaintiffs offered statistical evidence that women suffered a disproportionate number of downgrades within the defendant-company; statistical evidence of a clustering of women at lower-paying salary grades; evidence that management personnel who made promotion and demotion decisions held discriminatory attitudes towards women; evidence that the management personnel acted upon those attitudes through beneficial treatment for men in promotion and demotion decisions and through harassment of women; and testimony from several women regarding instances of sexual harassment. *Pitre*, 843 F.2d at 1268-70. The difficulty for Ms. Strickland is that any such evidence of discrimination on the basis of gender is absent in her case.