PUBLISH

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 23, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

ROBERT A. NAROTZKY, M.D.,
THOMAS A. KOPITNIK, JR., M.D.,
DEBRA STEELE, M.D., and CENTRAL
WYOMING NEUROSURGERY, LLC,

     Plaintiffs-Appellants,

    v.

NATRONA COUNTY MEMORIAL
HOSPITAL BOARD OF TRUSTEES;
WYOMING MEDICAL CENTER; INC.,
a Wyoming non-profit corporation;
WYOMING MEDICAL CENTER. INC.,
BOARD OF DIRECTORS; MIKE REID,
in his personal capacity and official
capacity; PAM FOLK, in her personal and
official capacity; VICKIE DIAMOND, in
her personal capacity and official
capacity; MARY JANE O'CONNOR, in
her personal and official capacity,

     Defendants-Appellees.

No. 09-8053

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. No. 2:08-CV-00027-CAB)

Patrick J. Crank, Speight, McCue & Crank, P.C., Cheyenne, Wyoming, (John B. "Jack" Speight and Robert T. McCue, Speight, McCue & Crank, P.C., with him on the briefs), for Appellants.

Stephenson D. Emery, Williams, Porter, Day & Neville, P.C., Casper, Wyoming, (Scott Ortiz, Williams, Porter, Day & Neville, P.C., with him on the brief), for Appellees.

.  ─────────────────────────

Before **TACHA**, **HENRY**, and **HARTZ**, Circuit Judges.

.  ─────────────────────────

**HENRY**, Circuit Judge.

─────────────────────────

Robert A. Narotzky, M.D., Thomas A. Kopitnik, Jr., M.D., and M. Debra Steele, M.D., doctors at Central Wyoming Neurosurgery, appeal the district court's grant of summary judgment in favor of the Natrona County Memorial Hospital Board of Trustees, the Wyoming Medical Center, Inc., the Wyoming Medical Center, Inc., Board of Directors, and various officials of those entities ("the Medical Center"). The district court granted summary judgment as to both of the plaintiffs' claims—a procedural due process claim based on a theory of constructive discharge and a claim based on the warrantless search of their lockers. Because we conclude that no constructive discharge occurred and that the search was reasonable, given the context and circumstances, we affirm the district court's grant of summary judgment as to both claims.[1]

─────────────────────────

[1] The district court treated the plaintiffs' allegations regarding the search of their lockers as a freestanding Fourth Amendment claim even though the plaintiffs' complaint does not set forth this allegation as a separate cause of action. Instead, the issue more fairly appears simply as part of the plaintiffs' overarching constructive discharge claim. Nonetheless, because the district court analyzed these allegations as constituting a

# I.  FACTUAL BACKGROUND

The Wyoming Medical Center is a non-profit entity organized and created under Wyoming law.  The Medical Center is managed, directed, and operated by a Board of Directors (the "Board"), which is created and appointed according to the Medical Center's bylaws.  The Central Wyoming Neurosurgery, LLC ("CWN"), whose members consisted of Drs. Robert Narotzky, Thomas Kopitnik, and Debra Steele, also referred to collectively as "CWN" in this opinion, held medical staff privileges at the Medical Center.  In late 2005, Drs. Narotzky, Kopitnik, and Steele resigned their privileges at the Medical Center.  They claim that their resignation was a constructive discharge that violated their procedural due process rights.  They also claim that the Medical Center violated their Fourth Amendment rights by conducting an unreasonable search of their lockers.

### A.  Dr. Kopitnik's conduct in the operating room, and the subsequent investigation and citation

In March 2004, Dr. Kopitnik performed a craniotomy on a patient at the Medical Center facility.  During the craniotomy, Dr. Kopitnik exited the operating room, leaving Robert Griffin, a physician's assistant, in charge of completing the surgical procedure.  Although Mr. Griffin was authorized to assist during surgeries, the Medical Center policy

---

separate substantive claim and because doing so does not change the outcome in this case, we will similarly consider the issue.

required that he do so only under "direct supervision" of a physician, defined as "over the shoulder" supervision. Pls. Confidential App. at 97. Dr. Kopitnik claimed that he had to leave the operating room to perform surgery on another patient who had already been anesthetized without his permission or authority.

After receiving a complaint filed by one of the nurses who witnessed the surgery, the Medical Center launched an investigation into the incident. A Peer Review Committee ("Review Committee") convened to investigate the alleged misconduct. The Review Committee determined that Dr. Kopitnik's actions constituted a Level III deficiency, or "major" deficiency in care. Dr. Kopitnik disputed the Review Committee's conclusion and requested that the Review Committee "re-review" the case. The Review Committee granted Dr. Kopitnik's request and adjusted the sanction to a deficiency level of II, or "minor" deficiency in care. Dr. Kopitnik disagreed with the revised decision, and asked the Review Committee to reconsider. The Review Committee conducted another review, and declined to change the Level II deficiency.

After the Review Committee conducted its third review, Dr. Kopitnik and CWN requested an evaluation of the case by an independent third party. The Review Committee agreed to submit the case to review by a third party only if Dr. Kopitnik agreed to be bound by the result. Dr. Kopitnik never responded to this offer, and the unchanged Level II deficiency citation against Dr. Kopitnik became final.

CWN disputes the validity of the peer review process afforded Dr. Kopitnik on procedural and substantive grounds. Procedurally, CWN asserts that the Review

4

Committee failed to follow the proper review process, as established by the Medical Center Staff Bylaws. Substantively, CWN claims that the peer review process was a sham motivated by the biases of Drs. Mary and Anne MacGuire (sisters who are both on the Review Committee). CWN claims that Dr. Kopitnik's actions during the procedure in question were common practice at the Medical Center and thus reasonable, and that he was unfairly singled out for the deficiency citation.

## B. Staffing conflicts between the Medical Center and CWN

In July 2004, approximately three months after Dr. Kopitnik's alleged failure to properly supervise Mr. Griffin during surgery, the Medical Center and CWN entered into a contract permitting CWN to provide its own operating room staff during surgeries that CWN performed at the Medical Center. The contract stated that CWN and the Medical Center would share the cost of the staff. The contract provided for a term of one year, but specified that either party could terminate the contract at any time with 90 days notice.

Following the conclusion of the peer review, the Medical Center attempted to contact CWN to discuss renewing the staffing contract. The Medical Center, however, received no response and formed an internal subcommittee to discuss the future arrangements. The subcommittee also met with CWN staff to receive input.

The subcommittee decided that it would not be feasible to continue with the CWN staffing agreement because it would require the Medical Center to provide two separate operating room teams, one for CWN surgeons and one for other surgeons at the Medical

5

Center. As a result, the subcommittee decided to recommend terminating the staffing arrangement with the appropriate 90 days' termination notice.

CWN claims that the staffing contract was terminated "in an effort to force the CWN physicians to resign their privileges at [the Medical Center]." Aplt's Br. at 16. CWN claims that although the Medical Center attempted to justify its decision on business grounds, the decision was actually extremely costly to the Medical Center. Id. at 18. CWN claims that "[t]his exclusive OR team was part and parcel of the critical and necessary resources needed to perform the highly difficult, delicate, and complicated neurosurgical procedures which CWN physicians were then performing at [the Medical Center]." Id. at 16.

### C. Theft and locker search

Following the citation of Dr. Kopitnik and termination of the staffing agreement, CWN refused to schedule any elective surgeries. The staffing agreement was set to expire on October 31, 2005. CWN performed its final surgery on October 30, 2005, and after it was completed, CWN staff began removing its equipment from the Medical Center.

On October 31, 2005, an inventory technician discovered that several instruments were missing from the Medical Center and notified his supervisors. The Medical Center staff viewed the surveillance tapes of the common areas of the hospital. The tapes showed CWN staff leaving the hospital with various equipment, bags, and boxes. The

Medical Center staff attempted to contact CWN to inquire as to whether any CWN employees may have taken any of the instruments but received no response.

After viewing the tapes, Medical Center security personnel opened and searched locker space belonging to CWN, looking for the missing instruments. The search turned up no incriminating evidence, and no theft charges were brought against any CWN staff members.

### D. Resignation and district court proceedings

Subsequent to reaching an agreement to practice with a different medical center in Cheyenne, Drs. Narotzky, Kopitnik, and Steele resigned their privileges at the Medical Center on November 15, 2005.

Drs. Narotzky, Kopitnik, and Steele, and CWN filed this 42 U.S.C. § 1983 action against the Medical Center and its governing individuals, alleging "one overarching claim . . . . [,] [e]ssentially that they had a vested property interest in their privileges at [the Medical Center], and that they were denied this property interest without due process of law . . . when they were constructively discharged." Aplt's App., vol. 7, at 1914. The plaintiffs also claimed that the search of their lockers violated their Fourth Amendment rights.

The district court granted summary judgment in favor of the Medical Center on both claims. In addressing CWN's due process claim, the court first found that Drs. Narotzky, Kopitnik, and Steele possessed a constitutionally protected property interest in their staff privileges at the Medical Center. Id. at 01915. The court then considered

7

whether the Medical Center constructively discharged the doctors (CWN). The court analyzed the constructive discharge under a four-factor test—(1) whether CWN was given some alternative to resignation; (2) whether CWN understood the nature of the choice; (3) whether CWN was given a reasonable time in which to choose; and (4) whether CWN was permitted to choose the effective date of resignation. Id. at 1916. The court explained that it considered the totality of the circumstances in making its determination.

With respect to factor one—whether the doctors were given an alternative to resignation—the court found that CWN could have availed itself of options aside from resignation. Specifically, the court noted that CWN could have filed a complaint with the Medical Center or filed a lawsuit. As to factor two—whether CWN understood the nature of the choice—the court found that the Medical Center did not force CWN to make a choice and did not issue an ultimatum. Thus, this factor also favored the Medical Center. In assessing the third factor—whether CWN was given a reasonable time in which to choose—the court looked to evidence that showed that CWN was contemplating a move long before its final decision to leave. Additionally, the court observed that "the surgeons had a reasonable amount of time to make their decision to stay or leave." Id. at 1919. Regarding the fourth factor—whether CWN was permitted to choose the effective date of resignation—the court found that CWN clearly was in control of the circumstances and "terminated the relationship without notice or communication." Id. at 1920.

8

Although the analysis of these four factors militated against a finding of constructive discharge, the court recognized that ultimately, the determination was not based on the mechanical application of these enumerated factors but on the totality of the circumstances. Id. at 1921–23. Consideration of all the circumstances, here, however, supported the conclusion that no constructive discharge occurred. The court emphasized that the CWN physicians sought additional employment options even before the conflicts with the Medical Center began. Moreover, the court noted that the physicians had numerous resources at their disposal—they were intelligent and influential neurosurgeons with knowledge and experience in legal matters. Id. at 1922. Finally, the court concluded that the resignation was not based on intolerable work conditions, as much as "insurmountable disagreements" for which both parties were responsible—"[b]oth [the Medical Center] and CWN created a hostile working environment for everyone at that hospital. . . . [;] all parties involved created a work environment that few would enjoy." Id. Thus, the court concluded that CWN was not constructively discharged and thus, no due process violation occurred.

In assessing the Fourth Amendment claim, the district court assumed that CWN had a reasonable expectation of privacy in the area searched. Nonetheless, the court determined that no Fourth Amendment violation occurred because the search was not unreasonable in light of the circumstances and context—the lower expectation of privacy in the locker and the justified suspicion on the part of the Medical Center. To establish that the search was reasonable, the Medical Center had to show that it was justified at its

9

inception and reasonably related in scope to the circumstances that justified it. Although the district court suggested that the Medical Center "jumped the gun" when it searched the lockers without gathering all relevant information," Id. at 1926, it nonetheless concluded that the search was justified at its inception based on the following facts: (1) a report from the Medical Center that the CWN staff had been searching through operating room trays before leaving the hospital; (2) the surveillance tapes showing CWN removing boxes of materials; (3) the missing instruments could only be used for neurosurgery; and (4) the phone calls and e-mail to the CWN were not returned. Additionally, the court found that the search was reasonable in its scope—the lockers belonged to the CWN surgeons and the areas searched were all large enough to contain the stolen instruments.

## II. DISCUSSION

CWN appeals the district court's finding that Drs. Narotzky, Kopitnik, and Steele were not deprived of a constitutionally protected property interest in their staff privileges at the Medical Center because they were not constructively discharged.[2] CWN also challenges the district court's finding that there was no Fourth Amendment violation.

### A. Was there a Due Process Violation under §1983?

CWN first claims that the district court erred when it granted summary judgment to the Medical Center and found that the Medical Center did not violate its procedural

---

[2] The parties have filed numerous motions while the resolution of this case was pending. Most recently the Appellees filed an "Amended Motion to Strike Appellants' Citation of Supplemental Authorities." This motion is hereby denied.

due process rights because its actions did not amount to a constructive discharge. In order to prevail on a procedural due process claim, a plaintiff must demonstrate: (1) the deprivation of a liberty or a property interest and (2) that no due process of law was afforded. Stears v. Sheridan Co. Mem. Hosp. Bd. of Trustees, 491 F.3d 1160, 1162 (10th Cir. 2007). However, if an employee voluntarily relinquishes a property interest, then no procedural due process violation has occurred. Yearous v. Niobrara C'nty Mem. Hosp., 128 F.3d 1351, 1355 (10th Cir. 1997). In that instance, the loss of the property interest results from the employee's own decision, and the employer may not be held liable on a procedural due process claim.[3]

We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court. Somaza v. Univ. of Denver, 513 F.3d 1206, 1211 (10th Cir. 2008). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)). When applying this standard, "[w]e examine the

---

[3] Although the parties suggest that the individual plaintiffs may more appropriately be characterized as independent contractors (as opposed to employees) of the Medical Center, we assume for purposes of this appeal that they are in fact employees because this court has never recognized a cause of action for the denial of procedural due process based on constructive discharge when the discharged party is an independent contractor. But see Smith v. Cleburne County Hosp., 870 F.2d 1375, 1381 (8th Cir. 1989) (holding that independent contractors may bring claims for constructive discharge). We note, however, that the plaintiffs' claim in this case would fail even with such an extension of liability because, as we explain below, the undisputed evidence demonstrates that the resignation of privileges was voluntary and not coerced.

11

factual record in the light most favorable to the non-moving party." Somaza, 513 F.3d at 1211.

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972). "Courts must look to existing rules or understandings that stem from an independent source such as state law to define the dimensions of protected property interests." Ripley v. Wyoming Med. Ctr., Inc., 559 F.3d 1119, 1122 (10th Cir.), cert. denied, 130 S. Ct. 287 (2009)

In this case, CWN claims that the roots of a protected property interest may extend beyond state statutes to include a hospital's rules and bylaws, and the Medical Center's specific bylaws governing the situation here create a constitutionally protected property interest in existing staff privileges. We need not decide this question, however, because even assuming that CWN has demonstrated the existence of a protected property interest, CWN has not shown that the Medical Center unconstitutionally deprived it of that interest.

"A constructive discharge occurs when a reasonable person . . . would view her working conditions as intolerable and would feel that she had no other choice but to quit." Tran v. Trustees of State Colleges in Colo., 355 F.3d 1263, 1270 (10th Cir. 2004); see Strickland v. United Parcel Service, Inc., 555 F.3d 1224, 1228 (10th Cir. 2009) ("Constructive discharge occurs when . . . 'working conditions [were] so intolerable that

12

a reasonable person . . . would feel forced to resign.'") (quoting Fischer v. Forestwood Co., 525 F.3d 972, 980 (10th Cir. 2008) (quotation omitted)). We apply "an objective test under which neither [CWN's] subjective views of the situation, nor [the Medical Center's] subjective intent . . . are relevant." Tran, 355 F.3d at 1270. The plaintiff has a substantial burden to prove a constructive discharge claim, Strickland, 555 F.3d at 1228, and "[w]hether a constructive discharge occurred is a question of fact," id. (citing Arnold v. McClain, 926 F.2d 963, 966 (10th Cir. 1991)). As the district court pointed out, factors that we consider in determining whether there was a constructive discharge include "(1) whether [CWN] was given some alternative to resignation; (2) whether [CWN] understood the nature of the choice [s]he was given; (3) whether [it] was given a reasonable time in which to choose; and (4) whether [CWN] was permitted to select the effective date of resignation." Parker v. Bd. of Regents of Tulsa Jr. College, 981 F.2d 1159, 1162 (10th Cir. 1992) (internal quotation marks omitted). Although these four factors are not necessarily determinative when there is no explicit forced choice between resignation and termination, they are nonetheless informative. See Lighton v. Univ. of Utah, 209 F.3d 1213, 1223 (10th Cir. 2000). Ultimately, "[a] resignation will be involuntary and coerced when the totality of the circumstances indicate [the lack of an] opportunity to make a free choice." Parker, 981 F.2d at 1162.

We conclude that the circumstances here did not constitute a constructive discharge. Instead, the actions of both parties produced a working environment that became mutually intolerable. The district court aptly described the situation when it

13

found that the resignation was not based on intolerable work conditions, as much as based on "insurmountable disagreements" for which both parties are responsible. Aplt's app., vol. 7, at 1922. We agree that "[b]oth [the Medical Center] and CWN created a hostile working environment for everyone at that hospital. . . . [A]ll parties involved created a work environment that few would enjoy." Id. at 1921; see Yearous, 128 F.3d at 1356 ("[T]his case exposes numerous instances of questionable judgment on behalf of all involved.").

We do not think that either the peer review process or the contract review process were such that they ultimately gave CWN no choice but to resign. The Bylaws set forth these procedures and, in its contract with the Medical Center, CWN had agreed to follow them. It also is important that the peer review process and subsequent citation did include an exchange between the two parties in which CWN had its views represented. CWN may have ultimately disagreed with the citation it received, but that alone cannot be grounds for a constructive discharge. Holding otherwise would risk allowing any citation (which the receiving party will likely disagree with) to become the grounds for a constructive discharge claim.

Consideration of the specific factors set forth in our precedent also supports the conclusion that there was no constructive discharge here. See Parker, 981 F.2d at 1162. First, the CWN physicians did have an alternative to resignation: namely continuing to work at the Medical Center and trying to resolve the problem. Second, the CWN physicians here are sophisticated neurosurgeons who understood the process and choices

14

offered to them.  Finally, CWN did not resign until after Dr. Kopitnik completed the peer review process and two weeks after the search of CWN's lockers.  Accordingly, the third and fourth factors—(3) whether the CWN physicians were given a reasonable time in which to choose and (4) whether the physicians were permitted to select the effective date of resignation—both overwhelmingly favor the Medical Center as well.

CWN also argues that the theft allegations and the search of the lockers contributed to an intolerable work atmosphere.  This argument, however, has little merit as these incidents occurred after the CWN physicians were already moving their equipment out of the Medical Center.  Thus, although they had not yet resigned, they had obviously made alternate arrangements.

Because both parties contributed to the hostile working environment and the relevant factors do not support the plaintiffs' theory of constructive discharge, the district court properly granted summary judgment to the Medical Center on CWN's due process claim.[4]

### B. Fourth Amendment Claim

---

[4] We note that CWN did not request a hearing.  The Bylaws, Chapter 12.2, "Grounds for Hearing," establish that the denial of Medical Staff membership and the denial of Medical Staff reappointment, are both grounds for a hearing.  Aplt.'s App. at 1568.  Chapter 12.3-1 of the Bylaws states that an individual who is entitled to a hearing must make such a request within 30 days.  Id. at 01570.

CWN brought its claims alleging a constructive discharge and we have thus addressed it primarily as such.  Because we agree with the district court that CWN was not constructively discharged, we need not determine whether their failure to request a hearing forecloses their procedural due process claim.

15

Next, CWN claims that the search of its lockers violated their Fourth Amendment rights. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. In determining whether a Fourth Amendment violation occurred, we first consider whether there was an expectation of privacy in the area searched. If so, we must determine whether the search was reasonable under the circumstances. O'Connor v. Ortega, 480 U.S. 709, 719 (1987). The district court's grant of summary judgment is reviewed de novo, applying the same legal standard as described above. Somaza v. Univ. of Denver, 513 F.3d 1206, 1211 (10th Cir. 2008).

In this case, we conclude that assuming CWN had a reasonable expectation of privacy in the lockers, the search was reasonable under the circumstances. With limited exceptions, a search or seizure requires either a warrant or probable cause. Camara v. Mun. Court, 387 U.S. 523, 528–29 (1967). Nevertheless, there are some circumstances in which "a warrant requirement is unsuitable." O'Connor, 480 U.S. at 720. In particular, if "the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search," Camara, 387 U.S. at 533, then a warrant may not be required by the Fourth Amendment. Thus, in New Jersey v. T.L.O., 469 U.S. 325, 334-35 (1985), the Supreme Court held that "the warrant requirement was not suitable to the school environment, because such a requirement would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools." O'Connor, 480 U.S. at 720.

In O'Connor, the Supreme Court held that a warrant was not required to authorize a public employer's search of an employee's office, desk, or file cabinets for a work-related purpose. See 480 U.S. at 722 (stating that "requiring an employer to obtain a warrant whenever the employer wished to enter an employee's office, desk, or file cabinets for a work-related purpose would seriously disrupt the routine conduct of business and would be unduly burdensome"). The Court further held that public employers' intrusions on the constitutionally protected privacy interests of government employees for noninvestigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances. Id. at 725-26.

Under this standard, "both the inception and the scope of the intrusion must be reasonable." Id. at 726. In applying this reasonableness standard, the courts must balance "the legitimate privacy interests of public employees in the private objects they bring to the workplace" against "the realities of the workplace," which include "the need to complete the government agency's work in a prompt and efficient manner." Id. at 721-22.

Our balancing of the relevant factors favors the Medical Center and shows that the search was reasonable both in its inception and in its scope. In particular, in October 2005, the Medical Center had legitimate grounds to suspect that its property might be found in CWN's lockers. Those grounds included: (1) the report of the inventory technician that surgical instruments were missing; (2) the surveillance tape that showed

17

CWN personnel leaving the hospital with various equipment, bags and boxes; and (3) the bad relationship between the parties. It also is relevant in assessing the reasonableness of the actions that the Medical Center's staff attempted to contact CWN both through e-mail and phone about the missing equipment but never received a response. In these circumstances, the Medical Center acted reasonably as it was searching to ensure that no additional supplies were removed from their facility and that any stolen items were recovered as soon as possible. The missing equipment could fit in the lockers, and it was therefore a permissible place for the employer to look, given time constraints and the sincere attempt to request permission.

## III.  CONCLUSION

For the foregoing reasons, we hereby AFFIRM the district court's grant of summary judgment as to both claims.