**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 25, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

TERRIANNE LOWE,

        Plaintiff-Appellant,

v.

INDEPENDENT SCHOOL DISTRICT
NO. 1 OF LOGAN COUNTY,
OKLAHOMA,

        Defendant-Appellee.

No. 08-6231
(D.C. No. 5:07-CV-01233-L)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **O'BRIEN**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and
**GORSUCH**, Circuit Judge.

---

## I. INTRODUCTION

Plaintiff Terianne Lowe filed suit against her former employer, Independent

School District No. 1 of Logan County, Oklahoma ("the District"), alleging that it

failed to reasonably accommodate her post-polio condition, in violation of the

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 ("ADA").[1]  The

district court granted summary judgment in favor of the District, and Ms. Lowe

appeals.  This court has jurisdiction under 28 U.S.C. § 1291.  We reverse.

## II.  BACKGROUND

Ms. Lowe had polio as a child and, as a result, has worn leg braces for most

of her life and has had several knee replacements.  She has been advised by her

physician that she will have to be in a wheelchair at some point and that walking

and standing for long periods will accelerate the deterioration of her leg muscles.

Ms. Lowe was certified to teach a variety of science courses for grades

seven through twelve and had experience as a classroom teacher.  Since the

1988-89 school year, Ms. Lowe had been employed by the District as a high

school counselor.  Because a counselor is a "teacher" under state law, Ms. Lowe

was employed under a standard teacher's contract with counseling duties added

pursuant to a separate "extra duty" contract.  Ms. Lowe's counselor position was

sedentary and required no accommodation for her disability.

In the fall of 2005, as a result of complaints from parents and staff about

Ms. Lowe's performance as a counselor at Guthrie High School, Terry Simpson,

the District Superintendent, determined that Ms. Lowe's extra-duty contract as a

---

[1]     Ms. Lowe also brought a claim under the Family Medical Leave Act which
she conceded at the summary judgment stage.  That claim is not an issue on
appeal.

counselor would not be renewed for the 2006-07 school year and that Ms. Lowe would, instead, be reassigned as a classroom teacher. Ms. Lowe was informed of this decision in March 2006 by Jan Chadwick, the principal of Guthrie High School. Ms. Lowe understood that her base salary as a teacher would not be affected by the reassignment but that she would lose the approximately $5700.00 in additional income she earned under the extra-duty contract as a counselor.

In May 2006, the temporary teaching contract of Mary Rhinehart expired and was not renewed by the District. Ms. Rhinehart had taught physical science at the high school in one of the smallest and most crowded classrooms that, as then configured, would not accommodate a walker or a wheelchair in the aisles between the lab tables. The physical science class, and all other science classes at the high school, were laboratory classes. The physical science class was the only opening for a science teacher at the high school for the 2006-07 school year.

Ms. Lowe, for reasons explained below, eventually came to understand that she would be reassigned to teach physical science in Ms. Rhinehart's small, crowded classroom. In order to plan for that contingency, Ms. Lowe met with Lori Allen, head of the Guthrie High School science department, to share with Ms. Allen her concerns about the reassignment in light of her disability. Ms. Allen did not question the need for such a meeting because she had learned from a school board member that Ms. Rhinehart was not retained in order to open up a teaching slot for Ms. Lowe in Ms. Rhinehart's former classroom. Together,

Ms. Lowe and Ms. Allen compiled a list of accommodations they believed necessary in order for Ms. Lowe to teach physical science in the laboratory science classroom formerly used by Ms. Rhinehart. Before the end of the 2005-06 school year, Ms. Lowe presented the list of accommodations and a letter from her physician to principal Chadwick, her immediate supervisor, to Don Bowman, the District's human resources director, and to Superintendent Simpson. Shortly thereafter, Ms. Chadwick was told by Don Bowman that no accommodation would be made and that Ms. Lowe should be assigned to a non-laboratory science class.[2] Ms. Chadwick passed this information along to Ms. Lowe.

By August 2006, Ms. Lowe had heard nothing from the District regarding her request for accommodation, other than the message from Mr. Bowman, relayed by Ms. Chadwick, that no accommodation would be made. Two weeks before school was to begin, Mary Pratz, an advocacy specialist and representative with the Oklahoma Education Association, set up a meeting attended by Superintendent Simpson, Ms. Lowe, Michelle Redus, president of the Guthrie Association of Classroom Teachers, and herself. The purpose of the meeting was to discuss the accommodations Ms. Lowe believed she would need in order to teach physical science in Ms. Rhinehart's former classroom. It is clear that, at the

---

[2] Apparently at this point, Mr. Bowman, like Superintendent Simpson, did not know that all high-school science classes were laboratory classes.

time of the August meeting, Ms. Lowe believed that such would be her assignment come the start of the new school year.

As we will discuss below, there is significant disagreement among those present at the August meeting as to what actually was said. One thing is clear: Ms. Lowe was dissatisfied with the result of the meeting and submitted her resignation two days later. She then filed charges with the EEOC and later retired from the District's employ.

Ms. Lowe eventually sued the District claiming violation of the ADA with regard to the reassignment, and failure to accommodate regarding the new teaching position. The district court granted summary judgment to the District on both claims. The district court determined that Ms. Lowe failed to show pretext in the District's proffered reason for her reassignment, a conclusion unchallenged on appeal. With regard to the failure-to-accommodate claim, the district court held that the claim failed because it was based only on Ms. Lowe's speculation as to where she would be assigned when school finally began. The court further concluded that "[b]ecause plaintiff resigned before classes started, she cannot show that the defendant failed to accommodate her disability." Aplt. App. at 491. On appeal, Ms. Lowe argues that the district court erred in granting summary judgment to the District on her failure-to-accommodate claim, and that she was constructively discharged as a result of the District's violation of the ADA.

## III.  DISCUSSION

"We review the district court's grant of summary judgment de novo." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1159 (10th Cir. 1999) (en banc). Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  We review the evidence in the light most favorable to Ms. Lowe as the nonmovant.  *See Midland Brake*, 180 F.3d at 1160.

In order "[t]o establish her claim under the ADA, [Ms. Lowe] must show: (1) she is a disabled person within the meaning of the ADA; (2) she is able to perform the essential job functions with or without reasonable accommodation; and (3) [defendant] discriminated against her because of her disability." *Albert v. Smith's Food & Drug Ctrs., Inc.*, 356 F.3d 1242, 1249 (10th Cir. 2004).

There is no dispute as to the first two requirements.  The issue is whether the District discriminated against Ms. Lowe because of her disability.  "The ADA defines the term 'discriminate' to include 'not making *reasonable accommodations* to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity. . . .'" *Midland*

*Brake*, 180 F.3d at 1161 (quoting 42 U.S.C. § 12112(b)(5)(A) (emphasis added)).

In *Midland Brake* "[w]e noted that the employer and employee must engage in an interactive process to determine what [accommodation] would be appropriate." *Albert*, 356 F.3d at 1252 (citing *Midland Brake*, 180 F.3d at 1171). "The obligation to engage in an interactive process is inherent in the statutory obligation to offer a reasonable accommodation to an otherwise qualified disabled employee." *Midland Brake*, 180 F.3d at 1172.

Once the District was in receipt of Ms. Lowe's list of possible accommodations and the letter from her doctor regarding the reassignment, it was required to proceed "in a reasonably interactive manner" with Ms. Lowe to determine what reasonable accommodation might be made to the physical-science-teaching job in order for her to perform it successfully. *See id.* "The interactive process is typically an essential component of the process by which a reasonable accommodation can be determined," and "includes good-faith communications between the employer and employee." *Id.* "Neither party may create or destroy liability by causing a breakdown of the interactive process." *Albert*, 356 F.3d at 1253. A question of fact as to whether an employer has failed to interact in good faith and thus failed to reasonably accommodate will preclude summary judgment for the employer. *Id.*

Defendant argues that "the interactive process is merely a <u>means</u> to achieve a reasonable accommodation rather than an independent substantive requirement."

-7-

Aplee. Br. at 10. While that is true, *see Rehling v. City of Chicago*, 207 F.3d 1009, 1015-16 (7th Cir. 2000) (recognizing that the interactive process the ADA contemplates is not an end in itself), a plaintiff can prevail if she can "show that the result of the inadequate interactive process was the failure of the [employer] to fulfill its role in determining what specific actions must be taken . . . in order to provide the qualified individual a reasonable accommodation," *id.* at 1016 (quotation omitted). In other words, a plaintiff must show "that the employer's failure to engage in an interactive process resulted in a failure to identify an appropriate accommodation for the qualified individual." *Id.*

The first step in analyzing Ms. Lowe's failure-to-accommodate claim is to determine whether her ultimate resignation was, as the district court concluded, based merely on her speculation as to where she would be reassigned. Contrary to the district court, we think that, given the information available to Ms. Lowe, she could have reasonably concluded that she would be assigned to teach a physical science class in a small and crowded classroom.

During litigation the District has maintained that, at the time she resigned, the location of Ms. Lowe's new assignment was still undecided. That assertion, however, is contradicted by the District's response to the EEOC inquiry where it stated that "Lowe was advised that for the 2006-2007 school year she would no longer have an extra duty assignment but would be assigned to teach a science class at Guthrie High School." Aplt. App. at 426. Further, Ms. Lowe testified

that she was told by Principal Chadwick and by Lori Allen, the head of the Guthrie High science department, that she would be teaching physical science in Ms. Rhinehart's former classroom. Ms. Chadwick testified that she was of the opinion that Ms. Rhinehart was not retained because the District needed the teaching slot for Ms. Lowe, and Michelle Redus, the head of the Guthrie Association of Classroom Teachers, learned from the head of the science department at the high school that Ms. Lowe would be teaching Ms. Rhinehart's physical science class. The science-department head had been told by Sheryl Pierson, a School Board member, that Ms. Rhinehart was not retained because the Board was going to put Ms. Lowe in her teaching slot and in her classroom. Even Superintendent Simpson testified that he understood why people assumed that Ms. Lowe would be teaching a lab science class and went as far as testifying that he never told Ms. Lowe that she would *not* be assigned to Ms. Rhinehart's old classroom.

Given all the evidence available to Ms. Lowe, much of it coming from defendant's agents, we think the district court erred in concluding that Ms. Lowe's view of the situation was based merely on her personal speculation. The fact that, even after the August meeting, Superintendent Simpson never informed Ms. Lowe that she would not have to teach in Ms. Rhinehart's classroom justified Ms. Lowe in her belief that she would not be able to resume duties as a classroom science teacher at Guthrie High School. Further, the

District's late-advanced theory that it could have placed Ms. Lowe in a junior high science class was never conveyed to her.

We turn now to the facts relative to the interactive process. *See Albert*, 356 F.3d at 1253 (noting that the required case-by-case determination "relies on an examination of the factual background of the interactive process"). Early on, as mentioned above, Ms. Lowe learned from Principal Chadwick that no accommodation would be made. Ms. Chadwick had been told this by the District's human resources director, Don Bowman, shortly after the District received the letter from Ms. Lowe's doctor outlining necessary accommodations. After this indirect contact by Mr. Bowman, the District failed for at least four months to respond directly to Ms. Lowe's suggestions for accommodation and only did so when prodded to act by Mary Pratz, an official from the Oklahoma Education Association.

When a meeting was finally convened at Ms. Pratz's behest, even Superintendent Simpson admitted that he did not prepare for it, had not reviewed Ms. Lowe's list of suggested accommodations, and did not know coming into the meeting that all science classes at the high school were lab classes. There is no dispute that Ms. Redus stated that the master schedule for the upcoming year at the high school indicated that Ms. Lowe would be teaching physical science, although there is also evidence that master schedules are sometimes changed at the last minute.

The pivotal issue is whether Ms. Lowe was told, at any time, that she would either be accommodated to teach the physical science class or that she would not have to teach a lab science class at all. The evidence on this point is contradictory. Ms. Lowe testified that Principal Chadwick told her early on that she would not be accommodated. Accounts of the August meeting, however, reveal a factual dispute on this point.

According to Ms. Lowe, Superintendent Simpson told her at the meeting that she would be teaching physical science without accommodation other than the assignment of a student to help her when she had to supervise a lab class. The consensus among those attending the meeting, other than Superintendent Simpson, was that no accommodation would be made. Mary Pratz, the Oklahoma Education Association representative, thought Mr. Simpson had indicated that Ms. Lowe would not be teaching a lab science class so very little accommodation would be necessary.

Superintendent Simpson's testimony, although more equivocal, contradicts Ms. Lowe's version of events. He stated that at the August meeting, "I believe I indicated that there was a possibility she would not be in a lab science." Aplt. App. at 132. Mr. Simpson testified he explained at the meeting that, should Ms. Lowe need assistance, an aide would be provided if necessary, but that the aide would not be a student because district policy did not allow student aides to assist with instruction. Mr. Simpson testified that, at the time of the meeting, he

had not decided where Ms. Lowe would be assigned, although that contradicts the District's earlier representation to the EEOC and the testimony of a school board member that Mr. Simpson had told the Board he was reassigning Ms. Lowe to a science classroom. At the time of the August meeting, Mr. Simpson knew that teachers at the junior high level could be assigned to the high school and that Ms. Lowe could then be assigned to a non-lab science class in a junior high, but he did not tell Ms. Lowe that. He testified that he did tell Ms. Lowe that they would make whatever accommodation was necessary and reasonable.

Mr. Simpson also testified, however, that he did not respond to concerns that Ms. Lowe would be asked to teach in the Rhinehart classroom, nor did he promise to follow up on the issue. He did not tell Ms. Lowe she would not have to teach in Ms. Rhinehart's classroom. This evidence raises a genuine issue of material fact as to whether the District complied with its obligation to reasonably accommodate Ms. Lowe, making summary judgment for the District on that issue inappropriate.

In addition to concluding that Ms. Lowe's failure-to-accommodate claim was too speculative, the district court held that "[b]ecause plaintiff resigned before classes started, she cannot show that the defendant failed to accommodate her disability." Aplt. App. at 491. We think this is wrong for two reasons.

First, Ms. Lowe's resignation did not preclude her failure-to-accommodate claim. In *Albert*, 356 F.3d 1242, the plaintiff's severe asthma prevented her from

-12-

continuing her job as a cashier. She applied unsuccessfully for other jobs with the defendant and worked for three weeks in customer service. The defendant then told her there were no more hours for her in customer service, but she could have her old cashier job back if her physician would approve. When he would not, the plaintiff stopped working and filed for unemployment. The fact that plaintiff had stopped working for the defendant did not preclude her from pursuing her failure-to-accommodate claim. Indeed, this court held that because the material facts about the interactive process were in dispute, it was error to grant summary judgment to the defendant. *Id.* at 1253.

To the extent the District implies that, had Ms. Lowe not resigned, it would have continued to work with her toward a reasonable accommodation, we note that the existence of a dispute concerning the status of the interactive process raises a genuine issue of material fact as to whether the District failed in its duty to reasonably accommodate Ms. Lowe. *See id.*

Second, Ms. Lowe has raised a genuine issue of material fact on her constructive discharge claim.[3] "Constructive discharge occurs when an employer unlawfully creates working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign." *Strickland v. United Parcel Serv., Inc.*, 555 F.3d 1224, 1228 (10th Cir. 2009) (quotation omitted). "The

---

[3] The district court referred to the showing necessary to establish constructive discharge in a footnote, but it did not rule separately on that claim. Aplt. App. at 48.

standard is objective:  the employer's subjective intent and the employee's subjective views on the situation are irrelevant.  Whether a constructive discharge occurred is a question of fact."  *Id.* (citation omitted).  We conclude that a genuine issue of material fact exists as to whether a reasonable person, faced with a teaching assignment that will require much standing and moving about, and knowing that such activity will hasten her muscular degeneration and the need for a wheelchair, would have no other choice but to resign.  *See Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 534 (10th Cir. 1998) (holding that the conditions of the job must be objectively intolerable and that the plaintiff must show that she had no other choice but to quit).

## IV.  CONCLUSION

The evidence produced by Ms. Lowe raises a genuine issue of material fact as to whether, by failing to engage in the interactive process in good faith, the District failed to identify an appropriate accommodation and thus violated the ADA.  It also raises a genuine issue of material fact as to whether a reasonable person, under the circumstances, would have felt compelled to resign.

We therefore REVERSE the district court's entry of summary judgment and REMAND this case for further proceedings in accordance with this order and judgment.

Entered for the Court


Wade Brorby
Senior Circuit Judge

08-6231 *Lowe v. Independent School Dist.*
**O'BRIEN**, J., concurring.

With the following observations, I join the Order and Judgment. In the spring of 2006 Lowe was on family leave, necessary because of a knee replacement. In March, 2006, shortly after she returned to work, Lowe was informed she would be reassigned from her counselor position to that of a classroom teacher, as she was certified to teach science. The news did not sit well with her because she preferred being a counselor and did not want to return to the classroom.[1] In April she applied for a position with Guthrie Job Corps (GJC) citing the reason for wanting to leave her position with the school district as "retirement."[2] She was offered full time employment, which she accepted on June 12, 2006. As of the date of the summary judgment motions she was still employed with GJC.

In the spring of 2006, the school district did not renew the teaching contract of Rhinehart, a <u>high school</u> science teacher. Lowe assumed she would be assigned to that position and so discussed the assumed change with the head of the high school science department. Later, but before the end of the school year, she

---

[1] Lowe originally complained that the school violated the Family Medical and Leave Act and her "demotion" from the counselor position violated the ADA. She conceded the FMLA claim on summary judgment motions and summary judgment was entered against her on the demotion claim. She does not appeal from that decision.

[2] Lowe was eligible to retire in 2002. Since then she had explored other job opportunities, hoping other employment would offer her two retirement incomes.

notified the school district of her need for an ADA accommodation if she was going to be assigned to the Rhinehart classroom. She supported her request with a letter from her treating physician and she outlined (with the help of the head of the science department) a list of accommodations she felt were necessary for her to teach in Rhinehart's classroom. *See* Appendix A. Through the school chain of command she was told no accommodations would be made as she would be assigned to a non-laboratory science class.

Lowe's assumptions about where and what she would teach may have been reasonable (they were, after all, shared by other school supervisory employees, albeit those without decision-making authority), but two additional matters must be factored into the equation. First, Lowe knew, from school policy and personal experience, that teachers were often reassigned to any position they were qualified to teach based upon the needs of the school and such assignments were often made at the last minute in the fall before school starts. Second, she was told no accommodations would be made because she would be assigned to a non-laboratory class. Again, she assumed, perhaps reasonably, such assignment was impossible because all high school science classes were laboratory classes. But junior high science classes, which she was certified to teach, do not have labs and any renovations to those classrooms that might have been needed to accommodate Lowe's disabilities were minimal.

Nothing happened during most of the summer, but in early August the matter was revisited when a meeting was held to discuss accommodations Lowe might require in order to teach science.[3] Lowe attended as did Superintendant Simpson, the ultimate decision-maker, and others. Lowe continued to express her preference to remain in the counselor position and her dismay at being forced back into the classroom. She wanted Simpson to revisit that decision. But the meeting also addressed her concerns about being able to effectively teach in a laboratory classroom unless her disabilities were accommodated. Simpson made clear that the major laboratory classroom renovation being pressed by Lowe, *see* Appendix A, would not be undertaken. As an alternative he suggested an aide might be hired to assist Lowe. Simpson claims he told Lowe she would not be required to teach a laboratory class. Lowe says no such representation was made. Pratz, a teacher advocate employed by the Oklahoma Education Association, was also at the meeting. Her recollection parallels Simpsons – "What my recollection is that Mr. Simpson's response was, it will not be a lab science class, so it won't need modifications." (R. at 368.) Nevertheless, a factual dispute remains with respect to that material issue of fact. Undisputed, however, is a salient fact – Simpson never mentioned reassigning Lowe to the junior high.

---

[3] The School District was not aware of Lowe's full time position with GJC.

It may be that Simpson had not reached a decision as to how, specifically, he would accommodate Lowe's needs and wanted to keep his options open. [4] On August 4, two days after the meeting and without requesting a definitive answer from Simpson as to what he would do in response to her concerns, Lowe sent her resignation letter, saying only, "Consider this my resignation. I am retiring." The letter gave no notice she was resigning due to the School District's failure to make reasonable accommodations, nor did she condition her resignation on such a failure.[5] An employer is not liable for failing to assure an employee reasonable

---

[4] Bill Sykes, former principal of Guthrie High School testified it is not uncommon to make classroom assignment changes shortly before the beginning of the school year. Chadwick, the principal at the time Lowe was notified she would be reassigned, testified that "[a] teacher can be reassigned at any time . . . . You could show up on the first day of school and if the building principal felt like they needed you in another area, could that be changed, yes, it could." (R. at 68-69, 307.) It is also uncontested that Lowe herself modified schedules at Chadwick's request while working at the high school. Thus, no matter what Lowe reasonably believed would probably happen, she did not know where she would finally be assigned. Unlike the plaintiff in *Albert v. Smith's Food & Drug Ctrs., Inc.*, Lowe did not wait for a final determination from the school, nor did she attempt other positions before she was faced with the choice of endangering her health or resigning. 356 F.3d 1242, 1246 (10th Cir. 2004).

[5] The record leaves no doubt the master schedule could easily change at any time. When there is room for doubt, a plaintiff cannot assume the worst. Rather, to demonstrate an employer will not make a reasonable accommodation, the statutory requirement for imposing liability, a plaintiff must show a specific request for a final determination and, if the employer does not respond in a reasonable time or reasonable accommodation is refused, the employer's decision is fair game. Of course, a plaintiff may bypass the interactive process when "an employer has essentially foreclosed the interactive process through its policies or explicit actions." *Davoll v. Webb*, 194 F.3d 1116, 1133 (10th Cir. 1999). In

(continued...)

-4-

accommodations will be made.  The statute imposes liability for "*not making*

reasonable accommodations to the known physical or mental limitations of an

otherwise qualified individual with a disability who is an applicant or

employee . . ."  42 U.S.C. § 12112(b)(5)(A) (emphasis added).  Lowe's resignation

may have short-circuited the process by not giving the School District an adequate

time to respond.[6]  We cannot know whether a reasonable accommodation would or

would not have been forthcoming.

On the other hand, it could be that the junior high option was concocted,

post hoc, as a convenient response to Lowe's ADA complaint.  If it was an option

Simpson was actively considering at the time of the August meeting, it was not

---

(...continued)
*Davoll*, we excused the plaintiff's failure to make a specific request for
reassignment because the City had a written policy against reassignment and she
was also explicitly told by her superior that the City would not help her find
another position.  *Id*.  Unlike *Davoll*, the School District's written policy was to
accommodate disabilities and no one explicitly told Lowe she must teach in a
certain classroom without accommodation.

   [6]  There is danger in focusing on the process and not the result.  The facts
show the School District was looking for a new principal during this time frame
and we cannot know all the other administrative duties and decisions which the
School District must attend to prior to a school year.  When we look to the timing
of the School District's actions and Superintendant's preparation for a meeting as
reasons to impose liability, we move dangerously close to asserting ourselves into
the management of day-to-day school administration priorities.  We "must be
mindful of the primary management role of [school district] officials who should
be free from second-guessing or micro-management from the federal courts."
*Estate of DiMarco v. Wyo. Dep't of Corr.*, 473 F.3d 1334, 1342 (10th Cir. 2007)
(addressing management role of prison officials).

then communicated to Lowe or anyone else; perhaps with good reason, perhaps not. The record sheds no light.

The School District argues, correctly, I think, that the interactive process is merely a method of facilitating statutory goals. It is a recommendation, not a statutory requirement. *White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995). "The federal regulations implementing the ADA 'envision an interactive process that requires *participation by both parties*.'" *Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998) (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)) (emphasis added). While it may be an essential component to understand the employee's needs, "a plaintiff cannot base a reasonable accommodation claim solely on the allegation that the employer failed to engage in an interactive process." *Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000) ("[T]he interactive process is a means and not an end in itself."). Clearly an employer could, with impunity, ignore the interactive process so long as it reasonably accommodated employee needs.

This case comes down to whether the School District would have accommodated Lowe's needs by reassignment to a non-laboratory classroom (as it could have done) had she not resigned in a huff.[7] Since the record does not supply an answer to that question with reasonable certainty this case must be tried.

---

[7] The School District's behavior is not a model for interactive engagement. However, the interactive process creates a duty on both parties to act in good faith. *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999). Lowe's good faith in the process is equally as questionable as the School District's. It was no secret Lowe resented her removal from the counseling position and did not want to return to the classroom. Lowe testified "[t]here were some places that they could have put me and that were discussed with Mary Pratz and with Lori Allen [head of high school science department] and with Michelle Redus. There were places that they could have put me." (R. at 259.) But Lowe never presented these alternatives to Simpson. (*Id.*) Lowe also testified there were some science classrooms at the high school where she could teach which would only require the lowering of the blackboard. The record does not indicate Lowe suggested she be assigned to these classrooms. Under these circumstances, it seems rather arbitrary to mention only the School District's shortcomings in the process.

Orthopaedic [*sic*] Specialists Incorporated

\* \* \* \*

April 5, 2006

RE:  Terrianne Lowe

TO WHOM IT MAY CONCERN:

Terrianne Lowe is a patient of mine who suffers from polio with postpolio syndrome extending back to 1952.  She has also had multiple surgical procedures on both lower extremities for contractures and weakness, and recently has undergone bilateral knee replacement with ultimate revision of her right knee replacement.  She has both proximal and distal weakness in her lower extremities.

Because of her muscle weakness and joint problems, this patient is unable to stand for any longer than ten minutes at a time and is unable to do any prolonged walking without orthotics and aids.  She has a functional limitation which requires sedentary work only.  She is unable to repetitively climb stairs; is unable to kneel, squat, or crawl.

Because of her significant functional limitations and disabilities, she will require appropriate accommodations at work to allow her to function within her limited capacity.

If I can provide any further information, please do not hesitate to let me know.

Sincerely,


/s/ Paul R. Miller, M.D.

(R. at 292.)

Laboratory Safety Modifications for Physical Disabilities

Classroom will need to be modified so teacher can be accessible to each table.
(Wider aisles to allow wheel chair/walker access)

Lab stations will need to be lowered.

Chalkboards/whiteboards will need to be lowered so are accessible from a sitting position.

Overhead cart and screen will need to be modified to accommodate a sitting position.

Eyewash station will need to be added that is accessible.

Fume hood will need to be added that is accessible.

Safety Shower will need to be added that is accessible.

Fire extinguisher and fire blanket need to be lowered.

Chemical and flammable storage will need to be modified so it is accessible.

General lab equipment storage will need to be modified so it is accessible.

Teacher aide will be needed to gather lab equipment, transport chemicals, and monitor safety issues during labs.

(R. at 295.)